Kevin H. Marino
John D. Tortorella
John A. Boyle
Roseann Bassler Dal Pra
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928-1488
Tel:  (973) 824-9300
Fax: (973) 824-8425
*Counsel for Defendant George Holley*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**vs.**<br><br>**GEORGE HOLLEY,**<br><br>**Defendant.** | **Case No. 3:11-cr-00066 (JAP)**<br><br>**CERTIFICATION OF KEVIN H. MARINO** |

KEVIN H. MARINO, of full age, hereby certifies and states:

1.      I am an attorney at law of the State of New Jersey and am a member of the law firm of Marino, Tortorella & Boyle, P.C., attorneys for Defendant, George Holley ("Holley"), in this matter.  I am fully familiar with the facts of this case and make this Certification in support of Holley's motion for entry of an Order, pursuant to Rules 7(d), 8(a), 12(b) and 18 of the Federal Rules of Criminal Procedure: (i) dismissing Counts One Through Three and Counts Five and Six of the Superseding Indictment for lack of venue; (ii) dismissing the Superseding Indictment as impermissibly duplicitous; (iii) dismissing the Superseding Indictment for failure to state an offense; and (iv) striking as surplusage the allegations concerning alleged tipping of Investors #2 and #4 from Counts One Through Three of the Superseding Indictment.

2.      Attached hereto as Exhibit A is a true and correct copy of the original Indictment in this matter.

3.      Attached hereto as Exhibit B is a true and correct copy of the Superseding Indictment in this matter.

4.      Attached hereto as Exhibit C is a true and correct copy of the Court's Order dated March 23, 2012, addressing the pretrial motions filed by George Holley and Phairot Iamnaita directed at the original Indictment.

5.      Attached hereto as Exhibit D is a true and correct copy of the transcript of the hearing held on April 4, 2012.

6.      Attached hereto as Exhibit E is a true and correct copy of an email from AUSA Christopher Kelly to Kevin H. Marino regarding evidence supporting the venue allegations in the Superseding Indictment.

7.      Attached hereto as Exhibit F is a true and correct copy of the Expert Report of Jeffrey H. Harris, Ph.D.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Executed on June 15, 2012

_____
KEVIN H. MARINO

2

# EXHIBIT A

RECEIVED

2010R00572/jwa/cjk

FEB - 4 2011

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

AT 8:30_____M
WILLIAM T. WALSH
CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Joel A. Pisano |
| | : | |
| | : | Crim. No. 11- 6 6 (JAP) |
| v. | : | |
| | : | 15 U.S.C. §§ 78j(b) and |
| | : | 78ff; 17 C.F.R. 240.10b-5 |
| GEORGE HOLLEY and | : | |
| PHAIROT IAMNAITA | : | 18 U.S.C. §§ 371, 1343, |
| | : | 1512(c)(2) and 2 |

I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting in Newark, charges:

COUNTS ONE THROUGH FOUR
(Securities Fraud)
15 U.S.C. §§ 78j(b) and 78ff;
17 C.F.R. § 240.10b-5

1. At all times relevant to this Indictment:

a. Defendant GEORGE HOLLEY, a resident of Norwalk, Connecticut, was the founder and Chairman of the Board of Home Diagnostics, Inc. ("Home Diagnostics"). Defendant GEORGE HOLLEY formerly served as Home Diagnostics' President and Chief Executive Officer. As the Chairman of the Board of Home Diagnostics, defendant GEORGE HOLLEY participated in board meetings and management discussions, and was privy to inside company information concerning the company's financials, business

-1-

plans and the potential sale, acquisition or merger of the company.  Defendant GEORGE HOLLEY had a duty not to disclose confidential information or material, nonpublic information he learned through his position with Home Diagnostics, or to use such information for his personal benefit or the benefit of others.

      b.  Defendant PHAIROT IAMNAITA was a citizen of Thailand whose principal residence was in Thailand.  Defendant PHAIROT IAMNAITA was defendant GEORGE HOLLEY's companion, and he regularly socialized and vacationed with defendant GEORGE HOLLEY. Defendant PHAIROT IAMNAITA also jointly invested with defendant GEORGE HOLLEY in several business ventures in Thailand.

      c.  Home Diagnostics was based in Fort Lauderdale, Florida, and was engaged in the business of developing, manufacturing and marketing diabetes management products, such as blood glucose monitoring systems.  The stock of Home Diagnostics was registered with the U.S. Securities and Exchange Commission, and was listed on the NASDAQ stock exchange under the ticker symbol "HDIX."  Home Diagnostics' policies prohibited the unauthorized disclosure of Home Diagnostics' confidential information.

      d.  Nipro Corporation was based in Tokyo, Japan, and was engaged in the business of developing, manufacturing and selling pharmaceutical products and medical devices.

-2-

e.     CW-1, a resident of New Jersey, was defendant GEORGE HOLLEY's long-time friend and business associate.

f.     Investor #1, a resident of New York and Arizona, was defendant GEORGE HOLLEY's long-time friend.

g.     Investor #2, a resident of Connecticut, was an employee of another company defendant GEORGE HOLLEY owned.

h.     Investor #3, a resident of Illinois, was defendant GEORGE HOLLEY's first cousin.

i.     Investor #4, a resident of Florida, was defendant GEORGE HOLLEY's long-time friend and a former Home Diagnostics employee.

### The Insider Trading Scheme

2.     From in or about September 2009 through in or about March 2010, defendants GEORGE HOLLEY and PHAIROT IAMNAITA, Investor #1, Investor #2, Investor #3, Investor #4 and others known and unknown, participated in an insider trading scheme by defendant GEORGE HOLLEY disclosing material, nonpublic information ("Inside Information") and defendants PHAIROT IAMNAITA, Investor #1, Investor #2, Investor #3, Investor #4, and others executing securities transactions based on Inside Information pertaining to Home Diagnostics.

3.     As Chairman of Home Diagnostics, defendant GEORGE HOLLEY obtained Inside Information and disclosed this Inside Information to defendant PHAIROT IAMNAITA, Investor #1, Investor

-3-

#2, Investor #3, Investor #4, and others in violation of: (a) a
duty of trust and confidence that defendant GEORGE HOLLEY owed to
Home Diagnostics; (b) the expectations of confidentiality of Home
Diagnostics; and (c) Home Diagnostic's written policies
concerning the use and safekeeping of confidential and material,
nonpublic information.

4.  Defendant GEORGE HOLLEY disclosed the Inside
Information to defendant PHAIROT IAMNAITA, Investor #1, Investor
#2, Investor #3, Investor #4, and others in breach of his duty of
confidentiality to Home Diagnostics and with the understanding
that defendant PHAIROT IAMNAITA, Investor #1, Investor #2,
Investor #3, Investor #4, and others would use the Inside
Information to purchase and sell securities, and thereby receive
substantial illegal profits.

5.  Defendant PHAIROT IAMNAITA, Investor #1, Investor #2,
Investor #3, Investor #4, and others, knowing that the Inside
Information had been disclosed in violation of defendant GEORGE
HOLLEY's duty of trust and confidence, executed securities
transactions on the basis of this Inside Information, earning
profits from the scheme.

### Object of the Scheme

6.  The object of the insider trading scheme was for
defendant GEORGE HOLLEY, defendant PHAIROT IAMNAITA, Investor #1,
Investor #2, Investor #3, Investor #4, and others to obtain money

-4-

by purchasing Home Diagnostics securities on the basis of Inside
Information gained by defendant GEORGE HOLLEY through his
position at Home Diagnostics.

### Manner and Means of the Insider Trading Scheme

7.   The manner and means by which defendants GEORGE HOLLEY
and PHARIOT IAMNAITA, Investor #1, Investor #2, Investor #3,
Investor #4, and others accomplished the object of the insider
trading scheme included, among other things, the following:

### Nipro's Acquistion of Home Diagnostics

8.   In or about June 2009, representatives of Nipro
contacted representatives of Home Diagnostics and expressed
interest in acquiring Home Diagnostics. From in or about June
2009 through in or about February 2010, representatives of Nipro
and Home Diagnostics were engaged in negotiations relating to the
potential acquisition of Home Diagnostics by Nipro.  As Chairman
of the Board of Directors for Home Diagnostics, defendant GEORGE
HOLLEY was aware of the overtures made by Nipro toward Home
Diagnostics at least as early as June 2009, and he was routinely
updated on the status of the ensuing negotiations.

9.   On or about December 21, 2009, Nipro increased its prior
offer to acquire Home Diagnostics and offered to pay a price of
approximately $11.50 per share of Home Diagnostics stock, which
represented a substantial premium over market value as of
December 21, 2009.  On or about December 22, 2009, Home

-5-

Diagnostics's Board of Directors, including defendant GEORGE
HOLLEY, met to discuss Nipro's offer.  Throughout January and
early February 2010, senior executives at Home Diagnostics
continued to advise the Board of Directors, including defendant
GEORGE HOLLEY, of the status of the negotiations with Nipro.  On
or about February 2, 2010, Home Diagnostics's Board of Directors
formally approved the proposed agreement with Nipro.

     10.   On or about February 3, 2010, Home Diagnostics issued
a press release announcing that Nipro had agreed to acquire all
outstanding shares of Home Diagnostics common stock for a total
amount of approximately $215 million, the equivalent of
approximately $11.50 per share.  On or about February 2, 2010,
before the announcement, Home Diagnostics shares closed at a
price of approximately $6.50 per share.  Following the
announcement, on or about February 3, 2010, the price of Home
Diagnostics shares rose to approximately $11.45 per share, an
increase of approximately 89%.

**Defendant PHAIROT IAMNAITA**

     11.   In or about January 2010, defendant GEORGE HOLLEY
called Investor #1 and asked him if he would be willing to open a
brokerage account on behalf of defendant PHAIROT IAMNAITA.
Defendant GEORGE HOLLEY told Investor #1 that defendant GEORGE
HOLLEY would fund the brokerage account.

     12.   After speaking with his financial advisor, Investor #1

-6-

called defendant GEORGE HOLLEY and told him that he could not open a brokerage account on behalf of defendant PHAIROT IAMNAITA because defendant PHAIROT IAMNAITA was not a United States citizen.

13. Subsequently, defendant GEORGE HOLLEY contacted CW-1 in New Jersey and asked CW-1 to assist defendant PHAIROT IAMNAITA in opening a brokerage account. Defendant GEORGE HOLLEY told CW-1 that the brokerage account would be used to purchase shares of Home Diagnostics.

14. On or about January 15, 2010, CW-1 and defendant PHAIROT IAMNAITA opened a joint brokerage account at Merrill Lynch in California (the "Merrill Lynch Account"). In the account opening documents, defendant PHAIROT IAMNAITA, who was then a citizen and resident of Thailand, falsely claimed to reside with CW-1 in New Jersey.

15. On or about January 12, 2010, defendant GEORGE HOLLEY sent CW-1 in New Jersey a check in the approximate amount of $121,700. On or about January 19, 2010, CW-1, at defendant GEORGE HOLLEY's direction, wired approximately $120,000 of this amount from his bank account in New Jersey to fund the Merrill Lynch Account.

16. After opening the Merrill Lynch Account and funding it with the approximately $120,000 that defendant GEORGE HOLLEY had provided, CW-1 and defendant PHAIROT IAMNAITA instructed their

-7-

broker to use the entire $120,000 to purchase shares of Home
Diagnostics. Acting on these instructions, between on or about
January 19, 2010 and on or about January 26, 2010, the broker
purchased more than 18,000 shares of Home Diagnostics stock.

17. Between on or about January 15, 2010 and on or about
January 23, 2010, during the time that the Merrill Lynch Account
was opened, funded, and used to purchase Home Diagnostics stock,
defendant GEORGE HOLLEY and defendant PHAIROT IAMNAITA were
traveling together in the United States.

18. Following the February 3, 2010, public announcement
that Nipro had agreed to acquire Home Diagnostics, CW-1 met with
defendant GEORGE HOLLEY and defendant PHAIROT IAMNAITA. In that
meeting, defendant GEORGE HOLLEY and defendant PHAIROT IAMNAITA
joked about the ease with which defendant PHAIROT IAMNAITA had
made money on the Home Diagnostics trades. Also, defendant
GEORGE HOLLEY admitted to providing Inside Information regarding
the acquisition of Home Diagnostics by Nipro to several other
persons. In addition, defendant GEORGE HOLLEY stated that he had
sent a set of analyst reports to several of the people to whom he
had provided Inside Information, and suggested that the reports
provided an alibi for those persons' purchases of Home
Diagnostics.

19. Also following the public announcement of the
acquisition of Home Diagnostics by Nipro, Merrill Lynch contacted

-8-

CW-1 regarding the purchases of Home Diagnostics stock in the
Merrill Lynch Account. Merrill Lynch sent to CW-1 in New Jersey
a written questionnaire regarding the Home Diagnostics'
purchases. Among other things, the questionnaire asked whether
CW-1 or defendant PHAIROT IAMNAITA was related to anyone at Home
Diagnostics, knew anyone at Home Diagnostics, or spoke to anyone
at Home Diagnostics. CW-1 discussed the questionnaire with
defendant PHAIROT IAMNAITA, who told CW-1 to state that they did
not have any connection to anyone at Home Diagnostics. In
response, CW-1 falsely informed Merrill Lynch that neither he nor
defendant PHAIROT IAMNAITA had any connections to anyone at Home
Diagnostics.

20. The questionnaire from Merrill Lynch also asked for the
reason or reasons for the purchases of Home Diagnostics in the
Merrill Lynch Account. Defendant PHAIROT IAMNAITA told CW-1 to
state that the purchases were based on defendant PHAIROT
IAMNAITA's review of analyst reports. Accordingly, CW-1 told
Merrill Lynch that defendant PHAIROT IAMNAITA decided to purchase
Home Diagnostics stock based on his review of analyst reports.

**Investor #1**

21. In or about early January 2010, defendant GEORGE HOLLEY
disclosed Inside Information to Investor #1 regarding the
anticipated acquisition of Home Diagnostics by Nipro, including
the fact that Home Diagnostics was currently negotiating with a

-9-

company that wished to acquire Home Diagnostics and that the negotiations were going well.

22.  On or about January 14, 2010 and on or about January 15, 2010, Investor #1 purchased approximately 2,000 shares of Home Diagnostics securities based on the Inside Information that defendant GEORGE HOLLEY provided to Investor #1.

**Investor #2**

23.  On or about January 4, 2010, defendant GEORGE HOLLEY disclosed Inside Information to Investor #2 regarding the anticipated acquisition of Home Diagnostics by Nipro.  Defendant GEORGE HOLLEY stated that Home Diagnostics was going to be purchased by another company and recommended to Investor #2 that he buy Home Diagnostics stock.  Defendant GEORGE HOLLEY told Investor #2, who was an employee of another company controlled by defendant GEORGE HOLLEY, to consider this Inside Information his bonus.

24.  On or about January 4, 2010, defendant GEORGE HOLLEY told Investor #2 that, if he were later questioned about his purchase of Home Diagnostics stock, Investor #2 should state that he bought the stock based upon his own independent research. Later on the same day, defendant GEORGE HOLLEY gave Investor #2 copies of several analyst and news reports concerning Home Diagnostics.

25.  Between on or about January 5, 2010 and on or about

-10-

January 29, 2010, Investor #2 purchased approximately 12,900 shares of Home Diagnostics stock based on the Inside Information that defendant GEORGE HOLLEY provided to Investor #2.

**Investor #3**

26. In or about late 2009, defendant GEORGE HOLLEY sent Investor #3 analyst and news reports regarding Home Diagnostics.

27. On or about January 9, 2010, defendant GEORGE HOLLEY called Investor #3 in Illinois and disclosed Inside Information to Investor #3 regarding the anticipated acquisition of Home Diagnostics by Nipro. Defendant GEORGE HOLLEY told Investor #3 that Home Diagnostics likely was going to be purchased and that it was a good opportunity to make money on the stock. At the beginning of the call, defendant GEORGE HOLLEY told Investor #3 that he was calling from a telephone line that was not traceable to defendant GEORGE HOLLEY.

28. Between on or about January 13, 2010 and on or about January 21, 2010, Investor #3 purchased approximately 12,700 shares of Home Diagnostics stock based in part on the Inside Information that defendant GEORGE HOLLEY provided to Investor #3.

**Investor #4**

29. In or about December 2009 and January 2010, defendant GEORGE HOLLEY and Investor #4 twice spoke over the telephone and defendant GEORGE HOLLEY disclosed Inside Information to Investor #4 regarding the anticipated acquisition of Home Diagnostics by

-11-

Nipro.   Defendant GEORGE HOLLEY suggested to Investor #4 that he
should really buy Home Diagnostics stock.

30.   Between on or about January 5, 2010 and on or about
January 12, 2010, Investor #4 purchased approximately 5,266
shares of Home Diagnostics stock based in part on the Inside
Information that defendant GEORGE HOLLEY provided to Investor #4.

31.   On or about the dates set forth below, in the District
of New Jersey and elsewhere, defendants

GEORGE HOLLEY
and
PHAIROT IAMNAITA

by use of the means and instrumentalities of interstate commerce,
the mails, and facilities of national securities exchanges,
directly and indirectly, knowingly and willfully used
manipulative and deceptive devices and contrivances in
contravention of Title 17, Code of Federal Regulations, Section
240.10b-5 (Rule "10b-5") in connection with the purchase and sale
of securities by (a) employing devices, schemes, and artifices to
defraud members of the investing public; (b) making untrue
statements of material facts and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and a course of business which
operated and would operate as a fraud and deceit upon persons, in
that Investor #1 and defendant PHAIROT IAMNAITA caused the

-12-

execution of the securities transactions listed below in the securities of Home Diagnostic based upon the material, nonpublic information defendant GEORGE HOLLEY obtained from Home Diagnostics:

| COUNT | DEFENDANT(S) | APPROX. DATE | SECURITIES TRANSACTION |
|-------|--------------|--------------|------------------------|
| 1 | GEORGE HOLLEY | January 15, 2010 | Investor #1 purchased 1,000 shares of Home Diagnostics stock |
| 2 | GEORGE HOLLEY<br><br>PHAIROT IAMNAITA | January 19, 2010 | Defendant PHAIROT IAMNAITA caused the purchase of 6,050 shares of Home Diagnostics stock |
| 3 | GEORGE HOLLEY<br><br>PHAIROT IAMNAITA | January 20, 2010 | Defendant PHAIROT IAMNAITA caused the purchase of 6,050 shares of Home Diagnostics stock |
| 4 | GEORGE HOLLEY<br><br>PHAIROT IAMNAITA | January 21, 2010 | Defendant PHAIROT IAMNAITA caused the purchase of 6,000 shares of Home Diagnostics stock |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff(a) and Title 17, Code of Federal Regulations, Section 240-10b-5.

-13-

## COUNT FIVE
### (Conspiracy to Commit Securities Fraud)
### 18 U.S.C. § 371

1.  Paragraphs 1 through 5 and 8 through 20 of Counts One through Four of this Indictment are realleged as if set forth in full herein.

2.  From in or about September 2009 through in or about March 2010, in the District of New Jersey and elsewhere defendants

GEORGE HOLLEY
and
PHAIROT IAMNAITA

did knowingly, willfully, and intentionally conspire and agree with each other and others to commit offenses against the United States, namely, securities fraud, that is, using or employing by the direct and indirect use of the means and instrumentalities of interstate commerce and the mails, in connection with the purchase and sale of any security, any manipulative device, including the purchase and sale of a security of an issuer on the basis of material nonpublic information about the security or issuer, in breach of a duty of trust or confidence that is owed directly, indirectly, and derivatively, to the issuer of that security, the shareholder of that issuer, and to any other person who is the source of the material nonpublic information, contrary to Title 15, United States Code, Sections 78j(b) and 78ff(a), and

-14-

Title 17, Code of Federal Regulations, Section 240-10b-5.

### Overt Acts

3.    In furtherance of the conspiracy and in order to effect the objects thereof, defendants GEORGE HOLLEY and PHAIROT IAMNAITA and their coconspirators committed or caused to be committed the following overt acts in the District of New Jersey and elsewhere:

a.    On or about January 12, 2010, defendant GEORGE HOLLEY sent to CW-1 in New Jersey a check drawn on defendant GEORGE HOLLEY's personal bank account in the approximate amount of $121,700, which CW-1 used to fund the purchase of Home Diagnostics shares on behalf of defendant PHAIROT IAMNAITA.

b.    On or about January 19, 2010, CW-1 wired approximately $120,000 from a bank account in New Jersey to the Merrill Lynch Account in California.

c.    On or about January 19, 2010, CW-1 and defendant PHAIROT IAMNAITA caused the purchase of approximately 6,050 shares of Home Diagnostics stock in the Merrill Lynch Account.

In violation of Title 18, United States Code, Section 371.

-15-

COUNT SIX
(Wire Fraud)
18 U.S.C. § 1343

1.    Paragraphs 1 through 5 and 8 through 20 of Counts One through Four of this Indictment are realleged as if set forth in full herein.

2.    On or about the dates set forth below, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, defendants

GEORGE HOLLEY
and
PHAIROT IAMNAITA

did, for the purpose of executing and attempting to execute the scheme and artifice, knowingly and intentionally cause to be transmitted by means of wire, radio, or television communications in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds:

| COUNT | APPROXIMATE DATE | WIRE COMMUNICATION |
|-------|------------------|--------------------|
| 6 | January 19, 2010 | Wire transfer of approximately $120,000 from CW-1's bank account in New Jersey to the Merrill Lynch Account in California |

In violation of Title 18, United States Code, Section 1343 and Section 2.

-16-

## COUNTS SEVEN AND EIGHT
### (Obstruction of Justice)
### 18 U.S.C. 1512(c)

1.  Paragraphs 1 through 5 and 8 through 20 of Counts One through Four of this Indictment are realleged as if set forth in full herein.

2.  In or about June 2010, the United States Attorney's Office for the District of New Jersey, the Federal Bureau of Investigation, and a federal grand jury sitting in Newark, New Jersey, commenced an investigation concerning potential insider trading by defendant GEORGE HOLLEY and others in the securities of Home Diagnostics.

**Investor #2**

3.  On or about December 8, 2010, Special Agents of the Federal Bureau of Investigation ("FBI") approached Investor #2 regarding his purchases of Home Diagnostics stock.  The FBI Special Agents approached Investor #2 at the offices where he worked for one of the companies defendant GEORGE HOLLEY owned.

4.  The next day, on or about December 9, 2010, defendant GEORGE HOLLEY directed his long-time executive assistant to give Investor #2 analyst and news reports concerning Home Diagnostics. That day, defendant GEORGE HOLLEY's executive assistant did as defendant GEORGE HOLLEY directed and gave the analyst and news reports to Investor #2.

-17-

**Investor #3**

5.    In or about November 2009, after learning that Investor #3 had been contacted by Special Agents of the FBI regarding his purchase of Home Diagnostics stock, defendant GEORGE HOLLEY reminded Investor #3 that he had previously given Investor #3 several analyst reports concerning Home Diagnostics.

**Production of Documents to the SEC**

6.    On or about April 20, 2010, defendant GEORGE HOLLEY, through counsel, produced documents to the U.S. Securities Exchange Commission in response to an investigative subpoena. In response, defendant GEORGE HOLLEY produced copies of analyst reports and press releases concerning Home Diagnostics, including the same analyst and news reports that defendant GEORGE HOLLEY had previously provided to Investor #2, even though these documents were not called for by the subpoena.

7.    On or about the dates set forth below, in the District of New Jersey and elsewhere, defendant

GEORGE HOLLEY

did corruptly obstruct, influence, and impede, and attempt to obstruct, influence, and impede, an official proceeding, namely, the grand jury's, the United States Attorney's Office's, and the FBI's investigation of insider trading in the securities of Home Diagnostics by engaging in the conduct listed below:

-18-

| COUNT | APPROXIMATE DATE | OBSTRUCTIVE CONDUCT |
|-------|------------------|---------------------|
| 7 | November 2010 | Encouraging Investor #3 to falsely claim he had purchased Home Diagnostics Stock based on analyst and news reports rather than based on the Inside Information provided by defendant GEORGE HOLLEY |
| 8 | December 9, 2010 | Causing Investor #2 to be provided with analyst and news reports so that Investor #2 could falsely claim that he had purchased Home Diagnostics stock based on the analyst and news reports rather than based on the Inside Information provided by defendant GEORGE HOLLEY |

In violation of Title 18, United States Code, Section 1512(c)(2) and Section 2.


A TRUE BILL


_____
FOREPERSON


_____
PAUL J. FISHMAN
UNITED STATES ATTORNEY


-19-

CASE NUMBER: 11-

# United States District Court
## District of New Jersey

UNITED STATES OF AMERICA

v.

GEORGE HOLLEY
and
PHAIROT IAMNAITA

# INDICTMENT FOR VIOLATIONS OF
## 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. 240.10b-5;
## 18 U.S.C. §§ 371, 1343, 1512(c)(2), and 2

A True Bill,

ᴗ

Foreperson

PAUL J. FISHMAN
*UNITED STATES ATTORNEY*
*NEWARK, NEW JERSEY*

JUSTIN W. ARNOLD
CHRISTOPHER J. KELLY
*ASSISTANT U.S. ATTORNEYS*
(973) 645-2700

USA-48AD 8
(Ed. 1/97)

# EXHIBIT B

2010R00572/jg/cjk

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Joel A. Pisano |
| | : | |
| | : | Crim. No. 11-066 |
| v. | : | |
| | : | 15 U.S.C. §§ 78j(b) and 78ff; |
| | : | 17 C.F.R. § 240.10b-5; |
| GEORGE HOLLEY | : | 18 U.S.C. §§ 1343, 1512(b)(3), |
| | : | 1512(c), and 2 |

## SUPERSEDING INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting in Newark, charges:

## COUNTS ONE THROUGH THREE
### (Securities Fraud)
### 15 U.S.C. §§ 78j(b) and 78ff;
### 17 C.F.R. § 240.10b-5

1.     At all times relevant to this Superseding Indictment:

        a.     Defendant GEORGE HOLLEY, a resident of Norwalk, Connecticut, was

the founder and Chairman of the Board of Home Diagnostics, Inc. ("Home Diagnostics").

Defendant GEORGE HOLLEY formerly served as Home Diagnostics' President and Chief

Executive Officer.  As the Chairman of the Board of Home Diagnostics, defendant GEORGE

HOLLEY participated in board meetings and management discussions, and was privy to inside

company information concerning the company's financials, business plans and the potential sale,

acquisition or merger of the company.  Defendant GEORGE HOLLEY had a duty not to disclose

confidential information or material, nonpublic information he learned through his position with

Home Diagnostics, or to use such information for his personal benefit or the benefit of others.

b.      Home Diagnostics was based in Fort Lauderdale, Florida, and was engaged in the business of developing, manufacturing and marketing diabetes management products, such as blood glucose monitoring systems. The stock of Home Diagnostics was registered with the U.S. Securities and Exchange Commission, and was listed on the NASDAQ Stock Market under the ticker symbol "HDIX." Home Diagnostics' policies prohibited the unauthorized disclosure of Home Diagnostics' confidential information.

c.      The NASDAQ Stock Market ("NASDAQ") was the largest electronic equity securities trading market in the United States in terms of listed companies, and the largest in the world in terms of share value traded. Since at least 2006, and at all times relevant to the Indictment, NASDAQ's data centers, through which all trading activity was conducted, were located in Carteret, New Jersey.

d.      Knight Equity Markets L.P. ("Knight"), located in Jersey City, New Jersey, was a registered broker-dealer that operated as a market maker in equity securities, primarily those traded on the NASDAQ and on the OTC Bulletin Board. At all times relevant to this Indictment, Knight maintained computer servers in Jersey City, New Jersey, and all trades made through Knight were conducted through the New Jersey-based servers.

e.      Pershing LLC ("Pershing"), located in Jersey City, New Jersey, was a financial services firm providing market access and trade execution services to its clients, including allowing its clients to electronically buy and sell securities. At all times relevant to this Indictment, Pershing maintained computer servers in Jersey City, New Jersey.

f.      Nipro Corporation was based in Tokyo, Japan, and was engaged in the business of developing, manufacturing and selling pharmaceutical products and medical devices.

-2-

g.      S.D., a resident of New Jersey, was defendant GEORGE HOLLEY's friend, and served as defendant HOLLEY's personal accountant.

h.      P.I. was a citizen of Thailand whose principal residence was in Thailand. P.I. was defendant GEORGE HOLLEY's companion, and he regularly socialized and vacationed with defendant GEORGE HOLLEY.

i.      Investor #1, a resident of New York and Arizona, was defendant GEORGE HOLLEY's long-time friend.

j.      Investor #2, a resident of Connecticut, was an employee of another company defendant GEORGE HOLLEY owned.

k.      Investor #3, a resident of Illinois, was defendant GEORGE HOLLEY's first cousin.

l.      Investor #4, a resident of Florida, was defendant GEORGE HOLLEY's long-time friend and a former Home Diagnostics' employee.

**The Insider Trading Scheme**

2.     From in or about September 2009 through in or about March 2010, defendant GEORGE HOLLEY participated in an insider trading scheme with at least six different investors, S.D., P.I., Investor #1, Investor #2, Investor #3, Investor #4, and others known and unknown (individually and collectively, the "Investors"), in which defendant GEORGE HOLLEY disclosed material, nonpublic information ("Inside Information") concerning Home Diagnostics to the Investors who, in turn, executed securities transactions based on that Inside Information.

3.     As Chairman of Home Diagnostics, defendant GEORGE HOLLEY obtained Inside Information and disclosed this Inside Information to the Investors in violation of:  (a) a duty of trust and confidence that defendant GEORGE HOLLEY owed to Home Diagnostics and its shareholders; (b) the expectations of confidentiality of Home Diagnostics and Nipro; and (c) Home Diagnostics' written policies concerning the use and safekeeping of confidential and material, nonpublic information.

4.     Defendant GEORGE HOLLEY disclosed the Inside Information to the Investors in breach of his duty of confidentiality to Home Diagnostics and its shareholders and with the understanding that the Investors would use the Inside Information to purchase and sell securities, and thereby receive substantial illegal profits.

5.     Knowing that the Inside Information had been disclosed in violation of defendant GEORGE HOLLEY's duties of trust and confidence, the Investors then executed securities transactions on the basis of the Inside Information, earning profits from the scheme.

-4-

## **Object of the Scheme**

6.     The object of the insider trading scheme was for defendant GEORGE HOLLEY

and the Investors, individuals with whom defendant GEORGE HOLLEY had close business or

personal relationships, to obtain money by purchasing Home Diagnostics securities on the basis

of Inside Information that defendant GEORGE HOLLEY gained through his position at Home

Diagnostics.

## **Manner and Means of the Insider Trading Scheme**

7.     The manner and means by which defendant GEORGE HOLLEY and the Investors

accomplished the object of the insider trading scheme included, among other things, the

following:

### **Nipro's Acquisition of Home Diagnostics**

8.     In or about June 2009, representatives of Nipro contacted representatives of Home

Diagnostics and expressed interest in acquiring Home Diagnostics.  From in or about June 2009

through in or about February 2010, representatives of Nipro and Home Diagnostics were engaged

in negotiations relating to the potential acquisition of Home Diagnostics by Nipro.  As Chairman

of the Board of Directors for Home Diagnostics, defendant GEORGE HOLLEY was aware of the

overtures made by Nipro toward Home Diagnostics at least as early as June 2009, and he was

routinely updated on the status of the ensuing negotiations.

9.     On or about December 21, 2009, Nipro increased its prior offer to acquire Home

Diagnostics and offered to pay a price of approximately $11.50 per share of Home Diagnostics

stock, which represented a substantial premium over market value as of December 21, 2009.  On

or about December 22, 2009, Home Diagnostics' Board of Directors, including defendant

GEORGE HOLLEY, met to discuss Nipro's offer. Throughout January and early February 2010, senior executives at Home Diagnostics continued to advise the Board of Directors, including defendant GEORGE HOLLEY, of the status of the negotiations with Nipro. On or about February 2, 2010, Home Diagnostics' Board of Directors formally approved the proposed agreement with Nipro.

10.     On or about February 3, 2010, Home Diagnostics issued a press release announcing that Nipro had agreed to acquire all outstanding shares of Home Diagnostics common stock for a total amount of approximately $215 million, the equivalent of approximately $11.50 per share. On or about February 2, 2010, before the announcement, Home Diagnostics shares closed at a price of approximately $6.50 per share. Following the announcement, on or about February 3, 2010, the price of Home Diagnostics shares rose to approximately $11.45 per share, an increase of approximately 89 percent.

**S.D. and P.I.**

11.     In or about January 2010, defendant GEORGE HOLLEY called Investor #1 and asked him if he would be willing to open a brokerage account on behalf of P.I. Defendant GEORGE HOLLEY told Investor #1 that defendant GEORGE HOLLEY would fund the brokerage account.

12.     After speaking with his financial advisor, Investor #1 called defendant GEORGE HOLLEY and told him that he could not open a brokerage account on behalf of P.I. because P.I. was not a United States citizen.

13.     Subsequently, on or about January 15, 2010, S.D. and P.I. opened a joint brokerage account at a branch of Merrill Lynch in California (the "Merrill Lynch Account"). In

-6-

the account opening documents, P.I., who was then a citizen and resident of Thailand, falsely claimed to reside with S.D. in New Jersey.

14.    On or about January 12, 2010, defendant GEORGE HOLLEY sent S.D. in New Jersey a check in the approximate amount of $121,700. On or about January 19, 2010, S.D. wired approximately $120,000 of this amount from his bank account in New Jersey to the Merrill Lynch Account.

15.    After opening the Merrill Lynch Account and funding it with the approximately $120,000 that defendant GEORGE HOLLEY had provided, S.D. instructed the broker to use the entire $120,000 to purchase shares of Home Diagnostics. Acting on these instructions, between on or about January 19, 2010 and on or about January 21, 2010, the broker purchased more than 18,000 shares of Home Diagnostics stock. All of these purchases were executed at NASDAQ's data center in Carteret, New Jersey.

16.    Following the public announcement of the acquisition of Home Diagnostics by Nipro, Merrill Lynch contacted S.D. regarding the purchases of Home Diagnostics stock in the Merrill Lynch Account. Merrill Lynch sent to S.D. in New Jersey a written questionnaire regarding the Home Diagnostics' purchases. Among other things, the questionnaire asked whether S.D. or P.I. was related to anyone at Home Diagnostics, knew anyone at Home Diagnostics, or spoke to anyone at Home Diagnostics. In response, S.D. falsely informed Merrill Lynch that neither he nor P.I. had any connections to anyone at Home Diagnostics.

17.    The questionnaire from Merrill Lynch also asked for the reason or reasons for the purchases of Home Diagnostics stock in the Merrill Lynch Account. In response, S.D. told Merrill Lynch that P.I. decided to purchase Home Diagnostics stock based on his review of

analyst reports.

**Investor #1**

18.     In or about early January 2010, defendant GEORGE HOLLEY disclosed Inside
Information to Investor #1 regarding the anticipated acquisition of Home Diagnostics by Nipro.

19.     On or about January 15, 2010, Investor #1 purchased approximately 1,000 shares
of Home Diagnostics stock based at least in part on the Inside Information that defendant
GEORGE HOLLEY provided to Investor #1. These shares were ordered and cleared through
Pershing's data servers in New Jersey, and then held in an electronic account on Pershing's data
servers in New Jersey.

20.     In total, on or about January 14, 2010 and on or about January 15, 2010, Investor
#1 purchased approximately 2,000 shares of Home Diagnostics stock based at least in part on the
Inside Information that defendant GEORGE HOLLEY provided to Investor #1.

**Investor #2**

21.     On or about January 4, 2010, defendant GEORGE HOLLEY disclosed Inside
Information to Investor #2 regarding the anticipated acquisition of Home Diagnostics by Nipro.
Defendant GEORGE HOLLEY told Investor #2, who was an employee of another company
controlled by defendant GEORGE HOLLEY, to consider this Inside Information his bonus.

22.     On or about January 4, 2010, defendant GEORGE HOLLEY told Investor #2 that,
if he were later questioned about his purchase of Home Diagnostics stock, Investor #2 should
state that he bought the stock based upon his own independent research. Later on the same day,
defendant GEORGE HOLLEY gave Investor #2 copies of several analyst and news reports
concerning Home Diagnostics.

-8-

23. Between on or about January 5, 2010 and on or about January 29, 2010, Investor #2 purchased approximately 13,000 shares of Home Diagnostics stock based at least in part on the Inside Information that defendant GEORGE HOLLEY provided to Investor #2.

**Investor #3**

24. In or about late 2009, defendant GEORGE HOLLEY sent Investor #3 analyst and news reports regarding Home Diagnostics.

25. On or about January 9, 2010, defendant GEORGE HOLLEY called Investor #3 in Illinois and disclosed Inside Information to Investor #3 regarding Nipro's anticipated acquisition of Home Diagnostics. At the beginning of the call, defendant GEORGE HOLLEY told Investor #3 that he was calling from a telephone line that was not traceable to defendant GEORGE HOLLEY.

26. Between on or about January 13, 2010 and on or about January 21, 2010, Investor #3 purchased approximately 12,700 shares of Home Diagnostics stock based at least in part on the Inside Information that defendant GEORGE HOLLEY provided to Investor #3. All of these shares were purchased from Knight in New Jersey.

**Investor #4**

27. In or about December 2009 and January 2010, defendant GEORGE HOLLEY and Investor #4 spoke over the telephone and defendant GEORGE HOLLEY told Investor #4 that he should buy Home Diagnostics stock.

28. Between on or about January 5, 2010 and on or about January 12, 2010, Investor #4 purchased approximately 5,266 shares of Home Diagnostics stock based at least in part on defendant GEORGE HOLLEY's recommendation.

-9-

29.     On or about the dates set forth below, in the District of New Jersey and elsewhere, defendant

## GEORGE HOLLEY

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, knowingly and willfully used manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 (Rule "10b-5") in connection with the purchase and sale of securities by (a) employing devices, schemes, and artifices to defraud members of the investing public; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and a course of business which operated and would operate as a fraud and deceit upon persons, in that the Investors identified below caused the execution of the securities transactions listed below in the securities of Home Diagnostic based upon the material, nonpublic information defendant GEORGE HOLLEY obtained from Home Diagnostics:

| COUNT | APPROX. DATES | SECURITIES TRANSACTION |
|-------|---------------|------------------------|
| 1 | January 15, 2010 | Investor #1 purchased approximately 1,000 shares of Home Diagnostics stock |
| 2 | January 13-21, 2010 | Investor #3 purchased approximately 12,700 shares of Home Diagnostics stock |
| 3 | January 19-21, 2010 | S.D. and P.I. purchased approximately 18,100 shares of Home Diagnostics stock |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff(a) and Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNT FOUR
### (Wire Fraud)
### 18 U.S.C. § 1343

1.      Paragraphs 1 and 8 through 17 of Counts One through Three of this Indictment are realleged as if set forth in full herein.

2.      On or about the dates set forth below, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, defendant

### GEORGE HOLLEY

did, for the purpose of executing and attempting to execute the scheme and artifice, knowingly and intentionally cause to be transmitted by means of wire, radio, or television communications in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds:

| COUNT | APPROX. DATE | WIRE COMMUNICATION |
|-------|--------------|--------------------|
| 4 | January 19, 2010 | Wire transfer of approximately $120,000 from S.D.'s bank account in New Jersey to the Merrill Lynch Account in California |

In violation of Title 18, United States Code, Section 1343 and Section 2.

-12-

## COUNT FIVE
### (Witness Tampering)
### 18 U.S.C. § 1512(b)(3)

1.      Paragraphs 1 through 5 and 24 through 26 of Counts One through Three of this Indictment are realleged as if set forth in full herein.

2.      In or about June 2010, the Federal Bureau of Investigation ("FBI") commenced an investigation concerning insider trading by defendant GEORGE HOLLEY and others in the securities of Home Diagnostics.

3.      In or about November 2010, after learning that Investor #3 had been contacted by Special Agents of the FBI regarding his purchases of Home Diagnostics stock, defendant GEORGE HOLLEY reminded Investor #3 that he had previously given Investor #3 several analyst reports concerning Home Diagnostics.

4.      In or about November 2010, in the District of New Jersey and elsewhere, defendant

GEORGE HOLLEY

did knowingly attempt to corruptly persuade Investor #3, and to engage in misleading conduct toward Investor #3, with intent to hinder, delay, and prevent the communication to agents of the FBI of information relating to the commission and possible commission of a Federal offense.

In violation of Title 18, United States Code, Section 1512(b)(3) and Section 2.

## COUNT SIX
### (Witness Tampering)
### 18 U.S.C. § 1512(b)(3)

1.     Paragraphs 1 through 5 and 21 through 23 of Counts One through Three of this Indictment are realleged as if set forth in full herein.

2.     In or about June 2010, the FBI commenced an investigation concerning insider trading by defendant GEORGE HOLLEY and others in the securities of Home Diagnostics.

3.     On or about December 8, 2010, FBI Special Agents approached Investor #2 regarding his purchases of Home Diagnostics stock.  The FBI Special Agents approached Investor #2 at the offices where he worked for one of the companies defendant GEORGE HOLLEY owned.

4.     The next day, on or about December 9, 2010, defendant GEORGE HOLLEY directed his long-time executive assistant to give Investor #2 analyst and news reports concerning Home Diagnostics.  Defendant GEORGE HOLLEY's executive assistant did as defendant GEORGE HOLLEY directed and gave the analyst and news reports to Investor #2.

5.     Previously, on or about April 20, 2010, defendant GEORGE HOLLEY, through counsel, produced documents to the U.S. Securities Exchange Commission in response to an investigative subpoena.  Defendant GEORGE HOLLEY produced copies of analyst and news reports concerning Home Diagnostics, including the same analyst and news reports that defendant GEORGE HOLLEY provided to Investor #2, even though these documents were not called for by the subpoena.

6.    In or about December 2010, in the District of New Jersey and elsewhere, defendant

GEORGE HOLLEY

did knowingly attempt to corruptly persuade Investor #2, and to engage in misleading conduct

toward Investor #2, with intent to hinder, delay, and prevent the communication to agents of the

FBI of information relating to the commission and possible commission of a Federal offense.

In violation of Title 18, United States Code, Section 1512(b)(3) and Section 2.

## COUNT SEVEN
### (Obstruction of Justice)
### 18 U.S.C. § 1512(c)(2)

1.     Paragraphs 1 through 3 of Count Five and paragraphs 1 through 5 of Count Six of this Indictment are realleged as if set forth in full herein.

2.     In or about June 2010, a federal grand jury sitting in Newark, New Jersey, commenced an investigation concerning insider trading by defendant GEORGE HOLLEY and others in the securities of Home Diagnostics.

3.     From in or about November 2010 through in or about December 2010, in the District of New Jersey and elsewhere, defendant

GEORGE HOLLEY

did knowingly and corruptly attempt to obstruct, influence and impede an official proceeding, namely, the grand jury's investigation of insider trading in the securities of Home Diagnostics.

In violation of Title 18, United States Code, Section 1512(c)(2) and Section 2.


A TRUE BILL


PAUL J. FISHMAN
UNITED STATES ATTORNEY


-16-

CASE NUMBER: 11-066 (JAP)

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

### v.

### GEORGE HOLLEY

# SUPERSEDING INDICTMENT FOR

15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5;
18 U.S.C. §§ 1343, 1512(b)(3), 1512(c), and 2

A True Bill,

**PAUL J. FISHMAN**
*U.S. ATTORNEY*
*NEWARK, NEW JERSEY*

CHRISTOPHER J. KELLY
*ASSISTANT U.S. ATTORNEY*
*(973) 645-6112*

USA-48AD 8
(Ed. 1/97)

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RECEIVED

MAR 23 2012

AT 8:30
WILLIAM T. WALSH M
CLERK

UNITED STATES OF AMERICA        :       Hon. Joel A. Pisano

        v.        :       Criminal No. 11-066

GEORGE HOLLEY and        :       <u>ORDER</u>
PHAIROT IAMNAITA

        This matter having come before the Court on the motions of defendant George

Holley (Kevin H. Marino, Esq. and John D. Tortorella, Esq. appearing) and Phairot Iamnaita

(Michael Critchley, Esq. and John Michael Vazquez, Esq. appearing), seeking to dismiss counts

one through six of the Indictment as duplicitous, to merge counts two through four of the

Indictment as multiplicitous, to strike surplusage from the Indictment, to dismiss the Indictment

for violation of defendants' right to counsel, for disclosure of the sealed portion of AUSA

Kelly's August 4th hearing testimony, for disclosure of FBI 302 reports and grand jury testimony

relating to Steven Dudas and John Campani, to preclude Steven Dudas from testifying, and for a

bill of particulars (Docket Entries 58, 59, 60, and 61), and the separate motion of defendant

Phairot Iamnaita seeking to dismiss the Indictment or to sever defendant Iamnaita (Docket Entry

58), and Paul J. Fishman, United States Attorney for the District of New Jersey (by Mark E.

Coyne, Judith H. Germano and Christopher J. Kelly, Assistant U.S. Attorneys), having opposed

defendants' motions in substantially all respects (Docket Entry 67), and the Court having

considered the written submissions and having heard the arguments of counsel, for the reasons

expressed by the Court on the record on March 13, 2012, and for good cause shown,

IT IS on this 35ᵗʰ day of ___March___, 2012, ORDERED as follows:

1.  Defendants' motion to merge counts 2-4 of the Indictment on the basis of multiplicity is DENIED as moot. The Government shall submit to the Court a redacted Indictment reflecting the merger of former Counts 2-4;

2.  The Court will reserve decision on defendants' motion to dismiss the Indictment on the basis of duplicity;

3.  The Court will reserve decision on defendants' motion to strike surplusage;

4.  Defendants' motion to dismiss for violation of defendants' right to counsel and to recuse members of the government prosecution team is DENIED;

5.  Defendants' motion for disclosure of the sealed portion of AUSA Kelly's August 4th hearing testimony is GRANTED IN PART and DENIED IN PART. Defendants' motion for the entire, un-redacted transcript of AUSA Kelly's August 4th hearing testimony is DENIED. The Government shall provide the redacted version of that transcript, which was previously submitted to the Court for *ex parte* review, to the defense;

6.  Defendants' motion for disclosure of FBI 302 reports and grand jury testimony relating to Steven Dudas and John Campani is GRANTED IN PART and DENIED IN PART. Defendants' motion for disclosure of John Campani's grand jury testimony is GRANTED. Defendants' motion for disclosure of FBI 302 reports concerning Campani and Steven Dudas and for any grand jury testimony of Steven Dudas is DENIED;

7.  The Court will reserve decision on defendant Iamnaita's motion to dismiss the Indictment or to sever defendant Iamnaita;

8.  Defendants' motion for a bill of particulars is DENIED; and

9.    Defendants' motion to preclude Steven Dudas from testifying is _reserved_ .

IT IS FURTHER ORDERED that a hearing shall be held on _April 4, 2012_ to _at 1:00 PM_

address any potential conflicts of interest to defense counsel posed by defendants' joint defense

agreement and/or defendant Holley's payment of defendant Iamnaita's legal fees. Defendants

Holley and Iamnaita shall appear in person at the hearing.


_____

HON. JOEL A. PISANO
United States District Judge

# EXHIBIT D

```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
                  CRIMINAL NO. 11-66

     UNITED STATES OF AMERICA    :
                                 :
               -vs-              : TRANSCRIPT OF PROCEEDING
                                 :
     GEORGE HOLLEY and PHAIROT    :          MOTION
     IAMNAITA,                    :
                                 :
                  Defendants.   :
    - - - - - - - - - - - - - - - - -
```

                                   Trenton, New Jersey
                                     April 4, 2012


          B E F O R E:


             THE HONORABLE JOEL A. PISANO
           UNITED STATES DISTRICT COURT JUDGE



          A P P E A R A N C E S:


          PAUL J. FISHMAN, U.S. Attorney
          BY:  JUDITH H. GERMANO, Assistant U.S. Attorney
          For the Government.




          Pursuant to Section 753 Title 28 United States
          Code, the following transcript is certified to be
          an accurate record as taken stenographically in the
          above-entitled proceedings.



                    _____
                     S/Joanne M. Caruso, CSR, CRR
                       Official Court Reporter
                          (908)334-2472

APPEARANCES CONTINUED:


MARINO, TORTORELLA & BOYLE
BY:  KEVIN H. MARINO, ESQ.,
     JOHN A. BOYLE, ESQ.,
     JOHN TORTORELLA, ESQ.,
For the Defendant Holley.



CRITCHLEY, KINUM & VAZQUEZ
BY: MICHAEL D. CRITCHLEY, ESQ.,
    JOHN M. VAZQUEZ, ESQ.,
For Defendant Iamnaita.

1              April 4, 2012

2         THE COURT:  Have a seat, everybody.

3    We have Mr. Holley is here, Mr. Iamnaita is here,

4    Mr. Marino, Mr. Tortorella, Mr. Critchley, Mr.

5    Vazquez.

6         A number of things that we need to accomplish

7    here and I know from the Government's point of

8    view, I know that what was on the agenda was this

9    question of the waiver as it applies to the defense

10   -- the defendants based upon the manner of

11   financing the retention of counsel, but if it's

12   okay with you, Miss Germano, I'd also like to

13   review some of our discussions on some other

14   issues.

15        MS. GERMANO:  Certainly, your Honor.

16        THE COURT:  Is that okay with you?

17        MS. GERMANO:  Yes, that would be fine.

18        THE COURT:  If you feel compromised because you

19  weren't prepared to do it, let me know.  I figured you're all

20  here, we'll get back into some of it.

21        MS. GERMANO:  Mr. Kelly would have liked to have been

22  here but he's out of the state this week.

23        THE COURT:  I hope he's doing something good.

24        MS. GERMANO:  Yes.

25        THE COURT:  Let's get this waiver issue out of the

1   way.

2         Mr. Marino, Mr. Critchley, I take it you've seen the

3   memorandum that I received from the Government?

4         MR. MARINO:  We have.

5         MR. CRITCHLEY:  Yes.

6         THE COURT:  Is there any opposition to this type of

7   questioning?

8         MR. MARINO:  No, your Honor.

9         THE COURT:  No?

10        MR. CRITCHLEY:  No, Judge.

11        THE COURT:  Why don't we ask Mr. Iamnaita to step up

12  and, Mr. Holley, if you would step up as well, I'd appreciate

13  it.  They can stay with you at counsel table.

14        MS. GERMANO:  Your Honor, if I may, we had one small

15  change to question number 24, which is on page two.

16        THE COURT:  Yes.

17        MS. GERMANO:  Just to clarify where it says "are you

18  satisfied with this situation" to clarify regarding the legal

19  representation and fee arrangement.

20        THE COURT:  I understood that to be the case.

21        I may not follow the script entirely.

22        MS. GERMANO:  That's fine.

23        THE COURT:  I may not follow it faithfully, but I'll

24  try to cover it in substance.

25        MR. VAZQUEZ:  Thank you.

1          Your Honor, before we start, just one thing on the

2    record, Mr. Iamnaita reads English, understands English,

3    speaks English.  Sometimes -- and we've gone over all the

4    proposed questions and there are no issues that we

5    anticipating in answering them.

6          Sometimes when we want to move quicker with Mr.

7    Iamnaita, we do use a translator so we don't want the Court to

8    think if we request a translator for some portions of the

9    trial, that it's because he has trouble.  It's just helps us

10   to expedite matters, a Thai translator.

11         THE COURT:  I leave it to you then, Mr. Vazquez, if

12   you think at any point in time a translator is necessary, let

13   me know and we'll, first of all, accommodate any needs that

14   the defendant has and if he wants us to get a Thai interpreter

15   in court, he's entitled to that.  You let us know.

16         You've raised the question and you've represented

17   that he understands English, so we'll rely upon that, but if

18   you get uncomfortable or he becomes uncomfortable and there's

19   a need for an interpreter, let us know.

20         MR. VAZQUEZ:  I don't anticipate any problem today.

21   We've had a chance to go over it ahead of time.  Sometimes

22   live testimony, he needs a little help, Judge, because it's

23   going so quickly.

24         THE COURT:  I'll try not to make this complicated.

25   Mr. Holley, good afternoon.

1           DEFENDANT HOLLEY: Good afternoon.

2           THE COURT:  Mr. Iamnaita, good afternoon.

3           DEFENDANT IAMNAITA: Good afternoon.

4           THE COURT:  At the outset, it is clear to both of you

5   that you're named as co-defendants in a criminal case.  As you

6   know, we have been leading up to the trial date of your case

7   which is now scheduled for sometime in the spring, isn't it?

8           MR. MARINO:  June.

9           THE COURT:  June.

10          There have been some proceedings in court and we're

11  going to have some others, but one of the things that has been

12  told to me is that Mr. Holley has agreed to pay the legal fees

13  and costs incurred in the defense of the case on behalf of Mr.

14  Iamnaita.  Is that correct?

15          DEFENDANT HOLLEY:  That's correct.

16          THE COURT:  Mr. Iamnaita.  Is that correct?

17          DEFENDANT IAMNAITA: Yes, that's correct.

18          THE COURT:  Now, this raises a potential problem

19  because of the general proposition that any one who is charged

20  with a criminal offense is entitled to be represented by a

21  lawyer at all stages of the case.  Any criminal defendant is

22  entitled to be represented by a lawyer who is devoted and

23  loyal only to the interests of his or her particular client.

24          Now, where there is a circumstance where that duty of

25  loyalty might become compromised, then I have a responsibility

 1  to make sure that everybody is aware of any potential problems

 2  and if the problems are not resolvable, then we'll move

 3  forward and see what needs to be done.

 4          In this particular case, I have been told, Mr.

 5  Holley, Mr. Iamnaita, that you are aware of your right to have

 6  an independent lawyer representing each of you; that each of

 7  you has chosen the lawyers whom you now have as your counsel

 8  and that Mr. Holley is paying for the costs of the defense and

 9  the fees incurred on behalf of Mr. Iamnaita.

10          Now, I want to start with you, Mr. Iamnaita.  Do you

11  understand that you have the right under the United States

12  Constitution to the effective assistance of counsel?

13          DEFENDANT IAMNAITA: Yes, I do.

14          THE COURT:  Has this been explained to you by Mr.

15  Vazquez, Mr. Critchley and anyone else in their office?

16          DEFENDANT IAMNAITA: Yes.

17          THE COURT:  Before we go any further, are you having

18  any difficulty understanding me?

19          DEFENDANT IAMNAITA: No, sir.

20          THE COURT:  Do you speak English proficiently enough

21  that you're comfortable going forward speaking to me in

22  English?

23          DEFENDANT IAMNAITA: Yes, I do.

24          THE COURT:  If you need the services of an

25  interpreter at any time, let me know and we'll try to

1   accommodate you.  Okay?

2           DEFENDANT IAMNAITA: Okay.

3           THE COURT:  Are you presently taking any medication?

4           DEFENDANT IAMNAITA: Yes, I do.

5           THE COURT:  What kind of medication?

6           DEFENDANT IAMNAITA: Zoloft.

7           THE COURT:  What does that do for you?

8           DEFENDANT IAMNAITA: Depression, anti-depression

9   medicine.

10          THE COURT:  Does it affect your ability to understand

11  what you're doing here today?

12          DEFENDANT IAMNAITA: No, sir.

13          THE COURT:  Okay.

14          Now, do you also understand that not only are you

15  entitled to be represented by a lawyer, that if you cannot

16  afford to pay an attorney, you can request the Court to

17  appoint a lawyer for you at no charge?  Are you aware of that?

18          DEFENDANT IAMNAITA: Yes.

19          THE COURT:  In this particular case you retained the

20  services of Mr. Critchley, Mr. Vazquez and the other lawyers

21  in their firm.  Is that right?

22          DEFENDANT IAMNAITA: Yes, that's right.

23          THE COURT:  Is it true that Mr. Holley is paying the

24  fees for your attorneys?

25          DEFENDANT IAMNAITA: Yes.

1          THE COURT:  Now, even though Mr. Holley is paying

2     your attorneys' fees, do you understand that your lawyers are

3     legally and ethically obligated to represent your interests

4     and only your interests and not those necessarily of Mr.

5     Holley?

6          DEFENDANT IAMNAITA: Yes, I understand.

7          THE COURT:  Now, do you understand that because Mr.

8     Holley is paying them, there is a potential conflict of

9     interest that perhaps Mr. Vazquez or Mr. Critchley might do

10    something in deference to Mr. Holley as to not jeopardize

11    their payment?

12         MR. VAZQUEZ:  If I can help.

13         I think the Judge is saying do you realize the

14    potential conflict since Mr. Holley is paying us, we might do

15    something to help Mr. Holley that would not help you?  That's

16    the potential conflict.

17         Do you understand that?

18         DEFENDANT IAMNAITA: Yes, I understand.

19         THE COURT:  Now, I'm telling you and they have

20    recognized to you, both Mr. Vazquez, Mr. Critchley and anybody

21    else in their office, that they have represented to you that

22    they have only your interests at heart.

23         DEFENDANT IAMNAITA: Yes.

24         THE COURT:  Do you understand that to be the case?

25         DEFENDANT IAMNAITA: Yes.

1          THE COURT:  Are you satisfied that they're being

2    truthful with you on that?

3          DEFENDANT IAMNAITA: Yes, exactly, your Honor.

4          THE COURT:  Okay.

5          Do you understand that both Mr. Critchley and Mr.

6    Vazquez are required to exercise their independent judgment in

7    speaking to you and giving you legal advice separate from what

8    might be in the best interests of Mr. Holley?

9          DEFENDANT IAMNAITA: Yes, I do understand.

10         THE COURT:  So that if they thought there was

11   something in dispute as between you and Mr. Holley, they

12   would, nevertheless, have the obligation to counsel you to do

13   what's right for you and not what's right for Mr. Holley?

14         DEFENDANT IAMNAITA: Yes, sir.

15         THE COURT:  Okay.

16         Now, do you understand that Mr. Holley and his

17   lawyers, Mr. Marino, Mr. Tortorella, Mr. Boyle and anybody

18   else from the firm that you may have met, are not in any way

19   to do anything that regulates or interferes with your lawyers'

20   representation of you?

21         DEFENDANT IAMNAITA: I do, sir.

22         THE COURT:  Do you also understand that your lawyers

23   do not have an attorney/client relationship with Mr. Holley,

24   unless, of course, you consent to it for any particular

25   purpose?

1          DEFENDANT IAMNAITA: I do, sir.

2          THE COURT:  And do you also understand that Mr.

3    Marino and the lawyers in his firm do not have an

4    attorney/client relationship with you?

5          DEFENDANT IAMNAITA: Yes, I do.

6          THE COURT:  Do you also understand that even though

7    Mr. Holley is paying your fees, your attorneys are not

8    permitted to reveal confidential information relating to their

9    representation of you to Mr. Holley or to his attorneys?

10         DEFENDANT IAMNAITA: Yes, I do.

11         THE COURT:  In other words, do you understand that

12   your lawyers may not communicate with Mr. Holley, with his

13   lawyers or their representatives unless you explicitly

14   consent?

15         DEFENDANT IAMNAITA: Yes, I do.

16         THE COURT:  Is it your understanding that Mr. Holley

17   will pay your lawyers in the regular course of business, in

18   the same way that he's paying his own lawyers?

19         DEFENDANT IAMNAITA: Yes, I do.

20         THE COURT:  And do you understand that Mr. Holley,

21   who has now committed to pay your bills, must continue to pay

22   them unless the Court tells him that he might not be under

23   such obligation?

24         DEFENDANT IAMNAITA: Yes, I do.

25         THE COURT:  Do you understand at some point, and this

1  may or may not be a hypothetical, but there might be a

2  possibility that Mr. Holley's interests and your interests in

3  this case may diverge?

4          DEFENDANT IAMNAITA: Yes, I do.

5          THE COURT:  Have you spoken to Mr. Critchley and Mr.

6  Vazquez about the subject of this potential conflict that I am

7  questioning you about?

8          DEFENDANT IAMNAITA: Yes.

9          THE COURT:  Mr. Critchley, Mr. Vazquez, do you

10 represent that you had a conversation with your client about

11 the potential conflicts of interest in connection with the

12 payment of your fees by Mr. Holley?

13         MR. CRITCHLEY:  Yes, your Honor.

14         MR. VAZQUEZ:  Yes, your Honor.

15         MR. CRITCHLEY:  We have incorporated those concerns

16 in our retainer agreement also.

17         THE COURT:  All right.

18         Now, Mr. Iamnaita, knowing what you know about all of

19 this, are you, nevertheless, satisfied with having Mr. Vazquez

20 and Mr. Critchley as your lawyers?

21         DEFENDANT IAMNAITA: I do.

22         THE COURT:  Are you comfortable with them in

23 representing you?

24         DEFENDANT IAMNAITA: Yes, I do.

25         THE COURT:  So far are you happy with the

1    representation that they've given you?

2              DEFENDANT IAMNAITA: Yes.

3              THE COURT:  And do you now -- do you understand,

4    lastly, that if you wanted me to, I could appoint an attorney

5    to have a conversation and give you advice about this

6    potential conflict?

7              DEFENDANT IAMNAITA: Yes.

8              THE COURT:  Do you want me to do that?

9              DEFENDANT IAMNAITA: No, sir.

10             THE COURT:  Okay.

11             Is it your desire to continue with Mr. Critchley and

12   Mr. Vazquez as your lawyers?

13             DEFENDANT IAMNAITA: Yes.

14             THE COURT:  And are you now waiving any potential

15   conflict of interest which may arise out of Mr. Holley's

16   payment of your fees?

17             DEFENDANT IAMNAITA: Yes.

18             THE COURT:  Thank you.  You can have a seat.

19             Mr. Holley, are you presently seeing any doctors?

20             DEFENDANT HOLLEY:  No.

21             THE COURT:  Are you taking any medication regularly?

22             DEFENDANT HOLLEY:  I take Lipator.

23             THE COURT:  Does that affect your ability to

24   understand what you're doing here today?

25             DEFENDANT HOLLEY:  No, it does not.

1           THE COURT:  Okay.

2           You have been present in court when you I questioned

3     Mr. Iamnaita about the fact that you're paying his legal fees.

4           DEFENDANT HOLLEY:  Yes, of course.

5           THE COURT:  I'm going to ask you questions similar to

6     that.

7           DEFENDANT HOLLEY:  Okay.

8           THE COURT:  Similar to those that I asked him.

9           Do you understand that as a defendant, you have a

10    right under the Constitution to the effective assistance of

11    counsel?

12          DEFENDANT HOLLEY:  Yes.

13          THE COURT:  Do you understand that that right

14    includes the right to be represented by an attorney who is

15    free from any conflicts of interest that might jeopardize his

16    representation of your interests?

17          DEFENDANT HOLLEY:  Yes.

18          THE COURT:  And do you understand that if you cannot

19    afford to retain counsel, you can request the Court to appoint

20    a lawyer for you at no charge?

21          DEFENDANT HOLLEY:  Yes, I do.

22          THE COURT:  Do you understand that all of those

23    rights also apply to Mr. Iamnaita?

24          DEFENDANT HOLLEY:  Yes.

25          THE COURT:  Now, you are, as I understand it, paying

1  the fees for Mr. Iamnaita's defense.  Is that right?

2          DEFENDANT HOLLEY:  Yes, I am, correct.

3          THE COURT:  Do you understand that even though you

4  are paying Mr. Critchley and Mr. Vazquez, their obligation is

5  to represent only the interests of Mr. Iamnaita and not of

6  yourself?

7          DEFENDANT HOLLEY:  Yes, I understand.

8          THE COURT:  And do you understand that they are

9  required to exercise independent judgment in counseling and

10 advising him regarding your case separate and apart from what

11 might be in your best interests?

12         DEFENDANT HOLLEY:  Yes.

13         THE COURT:  Do you understand that your attorneys are

14 prohibited from in any way directing or interfering with Mr.

15 Critchley's and Mr. Vazquez's use of their professional

16 judgment in representing their client?

17         DEFENDANT HOLLEY:  Yes, I understand.

18         THE COURT:  Do you understand that you do not have an

19 attorney/client relationship with Mr. Critchley or Mr.

20 Vazquez?

21         DEFENDANT HOLLEY:  I do.

22         THE COURT:  Do you also understand that your

23 attorneys don't have an attorney/client relationship with him?

24         DEFENDANT HOLLEY:  I do.

25         THE COURT:  I mean Mr. Iamnaita.

1          Now, do you understand that even though you're paying

2    Mr. Iamnaita's attorneys, they are not permitted to reveal

3    confidential attorney/client information relating to their

4    representation to you or to your lawyers unless he consents to

5    that disclosure?

6          DEFENDANT HOLLEY:  Yes, I understand that.

7          THE COURT:  And do you understand that you cannot

8    force Mr. Iamnaita to disclose or to consent to his attorneys'

9    disclosure of any confidential attorney/client communication

10   that he has with his lawyers?

11         DEFENDANT HOLLEY:  Yes, I understand.

12         THE COURT:  Do you understand that because you've

13   committed to pay his counsel fees, you're required to continue

14   paying them unless I relieve you of that obligation?

15         DEFENDANT HOLLEY:  Yes, I do.

16         THE COURT:  Do you recognize the potential conflict

17   of interest that we have been discussing?

18         DEFENDANT HOLLEY:  Yes.

19         THE COURT:  And is it your desire to continue paying

20   for the legal fees of Mr. Iamnaita?

21         DEFENDANT HOLLEY:  Yes, it is.

22         THE COURT:  And are you satisfied with the advice of

23   counsel on this subject that you received from Mr. Marino and

24   Mr. Tortorella and Mr. Boyle?

25         DEFENDANT HOLLEY:  Yes, I am.

1         THE COURT:  Are you satisfied with their advice of

2    counsel?

3         DEFENDANT HOLLEY:  Yes, I am.

4         THE COURT:  Do you presently waive any potential

5    conflict of interest that may arise out of your payment of

6    fees for Mr. Iamnaita?

7         DEFENDANT HOLLEY:  Yes.

8         THE COURT:  Anything further on the question?

9         MS. GERMANO:  No.

10        THE COURT:  Does that satisfy the Government?

11        MS. GERMANO:  Yes.

12        THE COURT:  I find both defendants have recognized

13   and understand their right to be represented by independent

14   counsel who have and will honor their duty of loyalty.

15        I further find that they have made a knowing and

16   voluntary waiver of any conflict of interest which may exist

17   as a result of the fact that Mr. Holley is paying for the

18   defense of Mr. Iamnaita.

19        MR. MARINO:  Thank you, your Honor.

20        THE COURT:  Now, have a seat, Mr. Holley.

21        Getting back to some of the issues that we discussed

22   and I want to preface this by saying, what I'm talking about

23   at this point is the oral argument that we had a month or so

24   ago on the defense motions for severance and/or dismissal of

25   the indictment, either in whole or in part.

1          I have to tell you, I have to tell all of you that

2    I've done a lot of thinking and reading on the subjects since

3    we were last together.  I've read not only the indictment over

4    several times, I've read all of your briefs again and I've

5    read a number of cases that have been cited in there.

6          I just want to state for the record some of the cases

7    that I've read because it's important for me to do that.  I've

8    read *Zafiro*, I have *McGill*, *Blackwell, Camiel*, of course the

9    *Rajaratnam* case, which is a recent insider trading case from

10   the Southern District of New York, *Haddy*, a subsequent

11   *Rajaratnam* opinion from the Southern District of New York.

12   The first one was dated July 13, 2010.  The second one is

13   November 24, 2010.  I have *Brassington, Rigas, Kelley Hughes*

14   and *Joseph Kelly* up here on the bench and I have two concerns,

15   Miss Germano.

16          The first is relevant to the defense arguments under

17   Rule 8(b), that there has been an improper joinder of the

18   defendants here in the way the indictment is structured.  As I

19   understand the argument that Mr. Critchley and Mr. Vazquez

20   were making, it is as follows:  That the indictment alleges

21   against Mr. Holley an overall scheme to engage in insider

22   trading; that the overall scheme is designed and is defined in

23   the indictment as communicating to five individuals that they

24   ought to buy stock in, what is it?

25          DEFENDANT HOLLEY:  Home Diagnostics.

1          THE COURT:  Home Diagnostics.

2          Although it is portrayed as a common scheme, it

3  appears that there is not a nexus between the five individuals

4  with whom Mr. Holley communicated.

5          Making it more complicated, there is in count five,

6  and, by the way, in those first counts, one through four, Mr.

7  Iamnaita is not named as a defendant.

8          In count five, there is a conspiracy to commit

9  securities fraud which incorporates all of the allegations

10  previous in the indictment and then names Mr. Holley and Mr.

11  Iamnaita in committing a conspiracy by engaging in a number of

12  acts whereby Mr. Iamnaita benefited from inside information

13  provided by Mr. Holley.

14          Count six then goes onto name both of the defendants

15  in one count of wire fraud, which coincides with one of the

16  overt acts in the conspiracy count.

17          Count seven and eight then name Mr. Holley in two

18  counts of obstructing justice.

19          Now, the argument, as I understand it --

20          MS. GERMANO:  Your Honor, I'm very sorry to

21  interpret, but if I may just note, both defendants are

22  actually named in count two, three and four.  It's just count

23  one of the indictment, this is on page 13, that is with regard

24  to the defendant Holley, but count two, three and four are

25  both.

 1          THE COURT:  Yes, I apologize.  They are wire fraud

 2   counts which, by the way, was the subject of another part of

 3   the defense motion wherein the Government agreed to

 4   consolidate, as I remember, the allegations in those three

 5   counts into one count.

 6          MS. GERMANO:  Yes, your Honor.

 7          THE COURT:  So if that were to occur, then there

 8   would be a count one in which Mr. Holley is named; count two

 9   in which Mr. Holley and Mr. Iamnaita are named as to these

10   three separate events of wire fraud; count four would be the

11   conspiracy charge; count five would be -- count six, rather,

12   would be a separate wire fraud and count seven remains the

13   obstruction of justice, seven and eight.

14          So as I understand the problem, as Mr. Critchley

15   articulated it, and Mr. Vazquez articulated it, because Mr.

16   Iamnaita is not named in count one, he is prejudiced because

17   all of the unrelated criminal conduct charged against Mr.

18   Holley is incorporated by reference into count two and what

19   would become three, right?

20          MR. CRITCHLEY:  Yes, sir.

21          THE COURT:  And he, therefore, claims there's an

22   improper joinder because under Rule 8(b), it cannot be said

23   that both defendants participated in the common scheme.  Is

24   that the argument?

25          MR. CRITCHLEY:  Yes, your Honor.

1          THE COURT:  Further complicating this, and this,

2     frankly, is where my head has been spinning on this.  Further

3     complicating it is the fact that the language from the counts

4     not relating to Mr. Iamnaita appears to be incorporated in the

5     conspiracy charge and paragraph one of count six and as a

6     result, the argument is that Mr. Iamnaita is unfairly

7     prejudiced because of that.

8          And it further is complicated by virtue of the

9     finding that I made that the language in the indictment as it

10    relates to the investor four, Mr. Campani, the language in the

11    indictment is not consistent with the testimony that that

12    gentleman gave to the Grand Jury and I required his transcript

13    to be turned over to the defense.

14         Now, in a post-argument brief, the Government argues

15    that I ought not to give great significance to that

16    inconsistency between Campani's testimony and the language in

17    the indictment, and Mr. Coyne in a letter memo suggests to me

18    that I ought to somehow engage in an editing exercise of the

19    indictment.

20         I really am struggling, Miss Germano, with what to do

21    about this.  I need some guidance here as to what options we

22    have because I do think that there are some problems.  The

23    easy way out of this would be to find a way, if it can be

24    done, I think the easy way out of this would be to sever the

25    counts properly brought against Mr. Iamnaita and Mr. Holley

1  together from those counts that are brought against Mr. Holley

2  that don't relate to Mr. Iamnaita, but I'm not sure how to do

3  that based upon the way the indictment is written.

4       So if you can give me some guidance here as to how

5  you would like to proceed, I would really appreciate it.

6  Putting it another way, and I haven't determined yet what to

7  do about this, but both sides, both defense counsel have urged

8  upon me, and there's language in some of these cases which

9  suggest that the proper way to resolve problems arising out of

10  these kinds of defects in indictments, if I do find it to be a

11  defect, is simply for the Court to dismiss the indictment and

12  then you can go back to the Grand Jury, I assume, and

13  supersede and try to correct the problem.

14       I'd like some guidance from you as to what options we

15  have here, knowing, of course, that we still -- it's only

16  early April.  We have a trial date in June, so I think things

17  can be done.

18       What is it that you would suggest?

19       MS. GERMANO:  Thank you, your Honor.

20       Severance is a very high burden as the case law makes

21  clear.  When there's, under Rule 8(b), when there's similar

22  transactions, there's a lot of leeway in terms of keeping a

23  case together as opposed to having us, and from what the Court

24  was discussing, Mr. Holley and his counsel coming back twice

25  in addition to a trial regarding a lot of the same evidence or

1   substantially all the same evidence that would involve Mr.

2   Holley and Mr. Iamnaita.

3          If I can start, your Honor, with the concerns you

4   raised about Mr. Campani and his Grand Jury testimony.  I am

5   concerned that defendants aggressive motion practice here sort

6   of taking things into a light that isn't appropriate really

7   because Mr. Campani was a witness who testified before a Grand

8   Jury, who then returned an indictment written as is before

9   your Honor.

10          We are later, months later looking at a cold

11   transcript of that record and so to the extent that there are

12   discrepancies between reports and the transcript, it was the

13   Grand Jury who approved this language, who saw him testify,

14   who was there as part of their job to evaluate his credibility

15   and what was said.

16          Ultimately, we agreed that to turn it over to the

17   defense is better that they have it at this point if there's

18   an issue and the Court was concerned about it, and we were

19   continued to fight about it, so what's done is done.  But I

20   wouldn't want to now take that concern, which was addressed by

21   making sure that defense has the transcript and presumably Mr.

22   Campani will testify at trial, they can fully cross-examine

23   him on the transcript with which they have now months ahead of

24   time.  That's how that would be addressed.

25          THE COURT:  I don't want to get off that.  The fact

1   of the matter is that -- by the way, I recognize that

2   obviously the proceedings in the Grand Jury are ordinarily

3   sacrosanct but under the circumstances, I found it appropriate

4   to turn the transcript over.  There really wasn't any

5   prejudice to the Government because if Mr. Campani were to

6   take the witness stand, you would have to give it to the

7   defense anyway.

8          The fact of the matter is that because they had

9   extrinsic evidence which led them to infer that there was an

10  in -- there might be an inconsistency in Campani's testimony,

11  I gave the transcript over and I don't know that it's

12  satisfying to me to think that the Grand Jury, well, even

13  though the witness didn't say something, the Grand Jury must

14  have inferred that that's what he meant when they approved the

15  language in the indictment, because that's the argument you're

16  making.

17         MS. GERMANO:  And, well, we're now -- we're now

18  giving additional scrutiny to that at this point where the

19  cure is to have him testify and be fully cross-examined.

20         THE COURT:  By the way, I have to tell you, I'm more

21  comfortable doing this now than if it had happened at trial.

22  The fact that there might have been aggressive motion practice

23  is immaterial to me and, frankly, I have been attempting to

24  let all of this stuff percolate and settle in my mind before

25  coming to judgment on it so that I'm not being precipitous in

1   making any rulings.  I'm really thinking long and hard about

2   this.

3             MS. GERMANO:  I hope that I didn't infer otherwise.

4             THE COURT:  No.

5             MS. GERMANO:  We really appreciate the Court's time

6   on this.

7             THE COURT:  I'm really wondering what -- I mean, if I

8   conclude that I don't draw the inference that the Grand Jury

9   simply understood Campani to say -- to mean what he didn't

10  say, then what?  Coyne says I should just take a blue pencil

11  and amend the indictment.  I don't think that's the Court's

12  function.

13            MS. GERMANO:  I think, your Honor, it's an issue that

14  we don't have to decide.  I'm not -- I think -- if defense

15  were troubled or the Court were troubled by the specific

16  language and how it did not exactly track Mr. Campani's

17  testimony, we would be happy to absolve -- get rid of that

18  issue by just the amendment that was suggested in Mr. Coyne's

19  letter.

20            THE COURT:  If I'm not capable of blue pencilling the

21  indictment, how is the United States Attorney?  Isn't that

22  what all the cases say?  Only a Grand Jury can correct a

23  deficiency in a charge.

24            MS. GERMANO:  And if that's an area that is seen as

25  causing concern, we could go back to a Grand Jury and adjust

1    that language and, quite frankly, it helps because then it's

2    one less issue that would be brought up at trial.

3            THE COURT:  That's why we're here today.  I want to

4    try to help.

5            MS. GERMANO:  And so we could do that, but to use a

6    concern on that point with regard to Mr. Campani to then

7    launch into a larger severance issue, I would ask that that

8    not happen.

9            THE COURT:  They're different.  The Campani problem

10   is a further complication of this and this is the thrust of

11   the severance argument, is that there's unfair prejudice to

12   Mr. Iamnaita because all of this material -- look, let's

13   recognize the theme of the indictment, the theme of the novel

14   is that for whatever his motivations, Mr. Holley had inside

15   information and he decided that he wanted to help five of his

16   friends, okay?  For whatever his reasons, this was his

17   intention, he wanted to help five of his friends and according

18   to the indictment, he set about calling five of his friends

19   and suggesting that they buy stock in Home Diagnostics.

20           There isn't any reason to know or to think that one,

21   two, three and four either knew each other or knew that Mr.

22   Holley had called each of them and the indictment doesn't

23   allege that Mr. Iamnaita knew or had reason to think that Mr.

24   Holley was calling them and speaking to those four people.

25           So when we get to trial, you're going to produce

1    evidence as to the four tips that Mr. Holley made to these

2    four individuals, one through four, and then you're going to

3    launch into an exploration of what Mr. Holley did in order to

4    help Mr. Iamnaita.

5           Mr. Iamnaita argues, well, I'm prejudiced by that

6    because I can't -- I'm not alleged to have been part of one

7    through four, but, nevertheless, all of this evidence of Mr.

8    Holley's common scheme or plan, which I'm not accused of being

9    part of, is going to come out here.

10          Now, I know a lot of the cases when they discuss this

11   multiple conspiracy versus single conspiracy or scheme

12   concept, *Kotteakos* and all the cases that discuss it, say

13   well, you know, you should only look at the language in the

14   indictment and you shouldn't take into consideration facts

15   outside the scope of the indictment.

16          In this particular case, nevertheless, we've had a

17   lot of litigating.  We had a lot of litigating starting with

18   the le fair Dudas and going through some other things that

19   have been out on the record, and I know, and it is a fact and

20   it will come out at trial, as I understand it, that there's a

21   personal relationship between the two defendants.

22          So how is it that you will not be able to argue,

23   either explicitly or through inference, that based on the

24   relationship between these two defendants, Mr. Iamnaita must

25   have been aware of and participated, at least passively, in

1    Holley's scheme with which Iamnaita is not charged?

2            That's my problem here and I say, you know, it would

3    be very simple to say, let's take the conspiracy charge and

4    try it, but we can't do that because the indictment is written

5    in such a way that everything else is inextricable.

6            MS. GERMANO:  At the last hearing, your Honor had two

7    excellent solutions for how to address this concern.  One, the

8    jury doesn't get the indictment and two, a curative

9    instruction to the jury that explains the evidence as to one

10   defendant versus the other.

11           To the extent that your Honor raised concerns about

12   the tippees not knowing each other and whether or not Mr.

13   Iamnaita was involved in discussions with the other tippees,

14   the defendants, through the briefing, have done a very good

15   job of making what is, in essence, a straightforward and

16   simple insider trading case into a much more complex thing by

17   conflating the law with regard to conspiracy versus the law

18   with regard to the substantive counts of the indictment.

19           So with regard to the conspiracy, what we need to

20   show is that Mr. Holley and Mr. Iamnaita had an agreement with

21   regard to the shares that Mr. Iamnaita traded -- obtained.

22           With regard to all of the facts of the indictment,

23   they're all related.  A lot of the evidence is the same

24   regarding one transaction, it's just Mr. Holley, it's the one

25   tippee, it's one stock, it's one operative time period and

1    there is evidence that would be -- that would pertain, even if

2    in the case of looking at just the conspiracy count, evidence

3    with regard to the other tippees would be material to the

4    agreement between Mr. Iamnaita and Mr. Holley and not to your

5    Honor's concern regarding would there be an innuendo of

6    chatter in the household among them, but actually substantive

7    evidence that we would intend to show with regard to the

8    transactions.  Where Mr. Holley -- that would indicate that

9    Mr. Holley knew the value of the evidence -- of the

10   information that he was giving to Mr. Iamnaita and how he

11   communicated with some of the other tippees.

12          So even if there were a severance, which we don't

13   think would be appropriate here, it wouldn't -- we'd have the

14   same problem because all the same evidence -- we'd be arguing

15   again, all the same evidence would still come in and that's

16   why Rule 8 is in place.

17          THE COURT:  So you think that if I were to grant a

18   severance, in trying the conspiracy charge against the

19   defendants, you would still introduce the tips to investors

20   one through four?

21          MS. GERMANO:  We would at least for some of them.  It

22   would be, at a minimum, it would be allowed -- we would ask

23   that it be admitted pursuant to 404(b), but it also can be

24   evidence of the scheme with regard to how defendant Holley

25   knew that this was material, non-public and valuable

1    information and that he was not allowed to be communicating it

2    through statements that he made to others as well.

3         Your Honor referenced looking to the *Rajaratnam* case

4    for guidance and that case is an excellent example because it

5    shows where some counts are severed and some counts were not

6    and the counts that were not severed did involve different

7    tippees without them all being connected through one

8    conspiracy and one agreement, but where it pertained to

9    certain of the same facts.  Like here, the same stock, same

10   time period, same key event such as here, the merger.

11        Then there were other cases that had to do with

12   multiple other stocks.  For example, if Mr. Holley were on a

13   board of directors of a different company and were tipping

14   completely other people in a different situation, and I think

15   the *Hughes* or the *Camiel* case is a good example of that.  It

16   was a 44-count indictment where they said there was no scheme,

17   that was not a conspiracy, but no scheme because it was two

18   distinct payroll accounts, there were four years and the

19   no-show jobs were doled out by actually warring political

20   factions, so there was no meeting of the minds to form a

21   common seem or a common purpose.  They were actually working

22   at odds to each other.

23        Here, as your Honor noted, it's one scheme with

24   regard to Mr. Holley and people close to him and then the

25   meetings of the mind just as to the one count of conspiracy,

1  is only regarding Mr. Holley and Mr. Iamnaita.

2            To the extent there's any concern about confusion of

3  the jury or spillover, that can be easily rectified, as it has

4  in many cases, with a curative instruction as well as we would

5  have no objection, obviously, to the jury not getting the

6  indictment, which is --

7            THE COURT:  How would the instructions sound?

8            MS. GERMANO:  When in specifying the counts, that

9  with regard to count one, which has to do with Mr. Holley and

10  investor number one, that that evidence is not to be

11  considered against Mr. Iamnaita and --

12            THE COURT:  So then you would agree you would not

13  argue circumstantially that Mr. Iamnaita ought to be imputed

14  to any knowledge of what Mr. Holley was doing with respect to

15  these others?

16            MS. GERMANO:  That because he was there and because

17  of his relationship with Mr. Holley?

18            THE COURT:  Yes.

19            MS. GERMANO:  Yes, and I'll confirm.  My lead counsel

20  is not here.

21            THE COURT:  How would you handle -- what portion of

22  any of the interactions between Holley and one through four,

23  what portion of it do you think is probative of the

24  conspiracy?

25            MS. GERMANO:  With regard to when Mr. Holley gave

1   information to one of the investors, he said consider this

2   your bonus, that shows that he knows that this was a financial

3   benefit and so that is material.

4           THE COURT:  So that would be held against Mr.

5   Iamnaita?

6           MS. GERMANO:  That would be with regard to the

7   conspiracy, that Mr. Holley was giving material information,

8   valuable financial, valuable information to Mr. Iamnaita.

9           THE COURT:  How could there be an effective jury

10  instruction that would be effectively prophylactic to protect

11  Mr. Iamnaita?

12          MS. GERMANO:  We would be happy to confer with

13  counsel at that point, but something along the lines would be,

14  you've heard evidence with regard to Mr. Holley and Mr.

15  Iamnaita.  As part of the evidence, you heard that Mr. Holley

16  tipped numerous investors, Mr. Iamnaita and others.  Ladies

17  and gentlemen, you are not to take any evidence of the fact

18  that Mr. Holley tipped investors one, two, three and four to

19  mean that then he must have tipped Mr. Iamnaita.  You should

20  look at the evidence with regard to Mr. Iamnaita separate and

21  apart from that evidence.  Something along the lines of that.

22  I can work on that and give the Court something.

23          THE COURT:  The conspiracy count has overt acts

24  relating to cooperating witness one.  The overt acts do not,

25  the overt acts do not involve these investors one through

1  four.

2       MS. GERMANO:  Right.  We would ask --

3       THE COURT:  But they are investors one through four

4  are implicated in the conspiracy count because all of those

5  paragraphs are incorporated into it.

6       MS. GERMANO:  And primarily the paragraphs talk about

7  Mr. Holley's role at Home Diagnostics, what his object of the

8  scheme by giving the information, it gives the background on

9  the transaction, all of which relates to both Mr. Iamnaita as

10  well as the other investors.  So those are material in terms

11  of explaining the scheme and what transpired.

12       THE COURT:  So if I can ascertain your suggestions

13  then, what you would propose to do is to go back to the Grand

14  Jury and deal with the Campani problem and otherwise leave the

15  indictment alone?

16       MS. GERMANO:  Well, yes, but if the Court were

17  concerned, so concerned that the Court were to think -- find

18  that the very heavy burden to allow severance was warranted,

19  we would like to discuss that further.

20       One of the other options would be that rather than

21  incorporating all of the paragraphs, we can look through if

22  there were other paragraphs that caused concern for the

23  conspiracy count and give a more specific notation.

24       THE COURT:  What's the mechanics of doing that?

25  Would you have to go back to the Grand Jury and supersede?

1          MS. GERMANO:  It would be a superseding indictment.

2     If the same Grand Jury is still sitting, we would go back to

3     that Grand Jury.  If it's a new Grand Jury, the procedure is

4     to represent --

5          THE COURT:  It could be begun?

6          MS. GERMANO:  It could be done.

7          THE COURT:  Even if I were to conclude that as I read

8     this problem, it's intractable and suggest I might dismiss the

9     indictment, you could also go back and do it over again,

10    right?

11         MS. GERMANO:  I believe so, your Honor, but if the

12    Court -- I mean, if the Court's concerns are clear enough, we

13    would just ask for an opportunity to go back and seek a

14    superseding indictment prior to any such decision which would

15    then restart bail conditions and the like.

16         THE COURT:  Right.

17         MS. GERMANO:  And so I think that that would address

18    any concerns with regard to the conspiracy count.

19         THE COURT:  I don't want to press you any further.

20    Why don't we go forth and go back to your office and think

21    about it and let me know what you want to do.

22         MS. GERMANO:  Yes, your Honor.

23         THE COURT:  I think my remarks and my questions

24    reveal that I'm concerned about this.

25         MS. GERMANO:  Understood, your Honor.  Thank you.

1          THE COURT:  Do you folks have anything to say?

2          MR. CRITCHLEY:  One time a Judge told me when you

3    stand strong, stand still.

4          MR. MARINO:  Nothing to add.

5          THE COURT:  Great.

6          MR. MARINO:  Thank you.

7          (Matter concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E

| | |
|---|---|
| **From:** | Kelly, Christopher (USANJ) 1 ████████████ |
| **Sent:** | Tuesday, May 22, 2012 2:10 PM |
| **To:** | Kevin Marino |
| **Cc:** | Germano, Judith (USANJ); J. Tortorella |
| **Subject:** | RE: United States v. Holley |
| **Attachments:** | HDIX+2(1).xlsx; Pages+from+Bluesheet+Report+_Jan_.pdf+-+Adobe+Acrobat[1].pdf |

Kevin:  In response to your request for discovery concerning the execution and clearing of certain trades, enclosed please find two documents.  The first was produced from NASDAQ.  The second was produced from the SEC.  To decipher the first spreadsheet, you may need certain codes.  The codes are contained at the following web address:  http://www.nasdaqtrader.com/dynamic/SymDir/mpidlist.txt.


Thanks.  Chris.


Christopher J. Kelly

Assistant U.S. Attorney

United States Attorney's Office




**From:** Kevin Marino [mailto:kmarino@khmarino.com]
**Sent:** Monday, May 21, 2012 8:46 PM
**To:** Kelly, Christopher (USANJ) 1; Germano, Judith (USANJ)
**Cc:** J. Tortorella; John Boyle; Roseann Bassler Dal Pra
**Subject:** United States v. Holley


Chris and Judy,

During this morning's call, the prosecution represented to the Court that there is no additional discovery necessitated by the Superseding Indictment.  Having reviewed the documents you have already produced, however, we can find no documentary evidence that (1) John Mullin ordered HDI shares and cleared trades of those shares through Pershing LLC's data servers in New Jersey, as alleged in the Superseding Indictment; (2) Robert Baiyor purchased HDI shares from Knight Equity Markets L.P. and conducted his trades in those shares through Knight's New Jersey-based servers, as alleged in the Superseding Indictment; or (3) the Investors, as defined in the Superseding Indictment, conducted their trading activity through NASDAQ data centers located in New Jersey, as alleged in the Superseding Indictment.  Please provide those documents immediately.  Additionally, kindly consider this a formal request under Rule 16 (a)(1)(E) that we immediately be permitted to inspect and copy any documents within the government's possession, custody or control that (i) are material to preparing Mr. Holley's defense; (ii) the government intends to use in its case-in-chief; or (iii) were obtained from or belong to Mr. Holley, and have not already been produced.  Finally, please provide us with any <u>Brady</u> material in the government's possession, custody or control.  In particular, we are interested in any <u>Brady</u> material contained in the oral statements made by Messrs. Mullin, Baiyor, Dudas and Campani.  We will augment this request as necessary, but wanted to be clear in our request for all items of discovery to which we are legally entited.


Thank you for your attention to this matter.


Kevin


**Kevin H. Marino, Esq.**

**Marino, Tortorella & Boyle, P.C.**

**437 Southern Boulevard**

**Chatham, NJ  07928-1488**

**Phone:  973-824-9300**

**Fax:  973-824-8425**

The information contained in this E-mail communication is transmitted by an attorney. It is privileged and confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or reproduction of this E-mail communication is strictly prohibited. If this E-mail communication has been received in error,please immediately return the message by E-mail to <u>ldalise@khmarino.com</u>. Thank you.

# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

vs.

GEORGE HOLLEY,

Defendant.

Case No. 3:11-cr-00066 (JAP)

EXPERT REPORT OF JEFFREY H. HARRIS, Ph.D.

I.      Qualifications

1.      I, Jeffrey H. Harris, am Dean's Chair in Finance at the Whitman School of

Management at Syracuse University.  Prior to joining the faculty at Syracuse, I taught at

Southern Methodist University, the University of Delaware (tenured), the University of Notre

Dame and the Ohio State University.  I have also served as Chief Economist at the U.S.

Commodity Futures Trading Commission (CFTC) in Washington, D.C.  As the CFTC Chief

Economist, I directed the economic analysis to support the Division of Enforcement in a wide

variety of cases.  I was in charge of directing economic research studies and providing

economic guidance to the Commission.  In this capacity, I recruited, hired and directed a team

of economists who interfaced with market surveillance and Enforcement staff regarding

economic issues.  I coordinated efforts with Enforcement attorneys regarding the potential for

market abuses and directed staff to apply economic analysis to support Enforcement cases

efficiently and effectively.  Through this work and my own research, I have become intimately familiar with the interface between the law and economics.

2.      My primary teaching responsibilities have spanned the areas of investments, derivative securities (options and futures), financial markets and institutions, and corporate finance.  I received my doctorate in Business Administration (Finance) from the Ohio State University in 1995 and a Masters of Business Administration from the University of Iowa in 1987.

3.      Earlier in my career I served a one-year term as Visiting Academic Fellow at the NASDAQ Stock Market and a one-year term as a Visiting Academic Scholar in the Office of Economic Analysis at the United States Securities and Exchange Commission (SEC) in Washington, D.C.  My academic work has been in the field of market microstructure, studying how trading behavior, market regulations and market structure interact.  I have published numerous articles in refereed finance journals, including the *Journal of Finance*, the *Journal of Financial Economics*, the *Journal of Futures Markets*, the *Journal of Investment Management*, and the *Review of Financial Studies*.  My publication record includes a variety of papers related to both the trading environment of and trading rules governing NASDAQ stocks.  In addition, I have served as a referee for a wide range of academic journals including *The Accounting Review, Journal of Banking and Finance, Journal of Business, Journal of Finance, Journal of Financial and Quantitative Analysis, Journal of Financial Markets,* and *Review of Financial Studies*, among others.

4.      I have testified on four separate occasions to various Committees and Subcommittees of the United States Congress, including "The Role of Speculative Investments in Energy Markets" before the United States Senate Subcommittee on Energy and Natural

Resources on September 16, 2008; "Financial Speculation in Commodity Markets: Are

Institutional Investors and Hedge Funds Contributing to Food and Energy Price Inflation?"

before the United States Senate Committee on Homeland Security and Governmental Affairs on

May 20, 2008; "The Influence of Speculative Traders in Commodity Markets" before the

United States House of Representatives Agriculture Committee on May 15, 2008; and "The

Influence of Non-commercial Institutional Investors on Oil Prices" before the United States

Senate Committee on Energy and Natural Resources on April 3, 2008.  Exhibit 1 contains my

curriculum vitae.

### II.    Assignment and Summary of Opinions

#### a.  Assignment and Compensation

5.      I have been retained by the law firm Marino, Tortorella and Boyle, P.C., in the

matter of <u>United States of America v. George Holley</u> to opine on various issues related to the

legal venue appropriate for this matter.

6.      For the time spent working on this matter I am being compensated at the rate of

$650 per hour.  My compensation is in no way conditioned on the outcome of this matter.

#### b.  Summary of Opinions

7.      The summary of my opinions is as follows:  First, that the stock of Home

Diagnostics was listed on the NASDAQ Stock Market[1] under the ticker symbol "HDIX" does not

mean that trades in that stock were conducted in New Jersey.  NASDAQ's corporate headquarters

are located in New York, New York.  As noted in NASDAQ's own 10-K report, they "currently

maintain and expect to maintain *multiple computer facilities* (emphasis added) that are designed

to provide redundancy and back-up to reduce the risk of system disruptions and have facilities

---

[1] The NASDAQ OMX Group, Inc. operates the NASDAQ Stock Market. Hereafter, I use the term "NASDAQ" to apply to
both entities, unless otherwise indicated.

in place that are expected to maintain service during a system disruption."[2]  NASDAQ operates at least two computer facilities on different power grids, one in Carteret, New Jersey and another in Ashburn, Virginia.  In fact, NASDAQ offers clients direct connectivity to both facilities: "Direct Connect clients may access all NASDAQ OMX® markets and market data feeds in both the Carteret, New Jersey, primary data center and the Ashburn, Virginia, backup facility."[3] Given that, it is my considered opinion that there is no basis to conclude that any portion of any trade at issue in this litigation was conducted through NASDAQ's servers in New Jersey.

8.      Second, Investor #1 traded through Westport in Connecticut, Investor #3 traded through Scottrade in Illinois, and both S.D. and P.I., traded through Merrill Lynch in California. Pershing LLC (Pershing) cleared trades for Investor #1, Knight Securities (Knight) for Investor #3 and Merrill Lynch (Merrill) for S.D. and P.I.  As clearing agents, Pershing, Knight and Merrill, may send orders directed to them out for execution elsewhere in accordance with Manning Rules for best execution of NASDAQ-listed stocks. Given that SEC Rule 11Ac1-5 acknowledges that market makers can (and do) execute trades as "market centers," the location of execution depends on internalization of orders against market maker inventories, the simultaneous execution (crossing) of customer orders at a brokerage and the routing decisions of market participants.  Given the fact that orders in NASDAQ-listed stocks are more than likely to be routed/internalized/crossed in various locations and parts of orders may execute at many different locations, it is my considered opinion that there is no basis for stating that the orders in this case were ordered, purchased, executed or otherwise conducted in New Jersey.

9.      Third, there is no basis to say that the trades at issue in this case were cleared in New Jersey.  The ultimate location of clearing for all NASDAQ-listed stocks in the United States

---

[2] See p. 25 of the 10-K report for The NASDAQ OMX Group, Inc. filed February 11, 2011 with the United States Securities and Exchange Commission, Washington, DC  20549.
[3] See http://www.nasdaqtrader.com/content/ProductsServices/Trading/DirectConnect_FactSheet.pdf

is the National Securities Clearing Corporation (NSCC). The NSCC's offices, which are located in New York, New York, are physically and visually readily identifiable.

10.     For this expert opinion I have relied on the information contained in the documents listed in the Reference section below.  Accordingly, if additional materials or any new facts are brought to my attention, I reserve the right to modify or update my opinions.

### c.  Organization of Report

11.  The remainder of my report is organized into the following sections.  In Section III, I provide perspective on the historical development of trading in NASDAQ-listed stocks.  In Section IV, I provide an overall discussion of some statements made regarding this case in the Superseding Indictment and in Section V, I state my conclusions.

## III.  NASDAQ Trading in Perspective

12. NASDAQ, the world's first electronic stock market, began operating on February 8, 1971, providing a computerized venue for posting stock quotes, but not for stock trading.[4]  The first technology linked together more than 500 market makers nationwide and allowed NASDAQ to provide real-time individual dealer quotes on a large number of stocks. Importantly, NASDAQ incorporated no aggregate quotes or order execution facility so, despite the electronic dissemination of quotes, trades were still executed via telephone. In July 1980, NASDAQ replaced the original technology with larger and faster (Harris) terminals which provided not only individual dealer quotes, but also summarized the best bid and offer quotes across the dealer community.

13.  In 1984, NASDAQ offered the first U.S. system for automated order execution—the Small Order Execution System (or SOES).  For various reasons, SOES was operational only for

---

[4] Much of the information in this section is also found in Harris and Saad (2005). See Smith, Selway and McCormick (1998) for a complete history of NASDAQ's background.

small trade sizes, but fundamentally changed the interaction of traders in the NASDAQ market. Technology could, for the first time, display, execute, and confirm trades without telephone intervention.  In the process, NASDAQ was transformed from an aggregator of market information into a more mature market that displayed firm quotes that could be accessed at guaranteed prices.[5] The vast majority of NASDAQ trading volume, however, was still executed via telephone.[6]

14. The NASDAQ Workstation was introduced in 1986, utilizing improved technology to deliver ever more information to traders. The Workstation offered DOS-based software, making it possible to use a common PC as a NASDAQ interface. The Workstation added multiple enhancements to the user interface to better convey information to broker-dealers and the investing public.

15. In response to market makers refusing to answer their phones during the crash of 1987, NASDAQ implemented mandatory participation in SOES.  The SOES system allowed investors to make automated trades of up to 1000 shares against posted NASDAQ quotes without using the phone.  In response to market maker complaints, NASDAQ reduced the eligible size of trades on SOES to 500 shares in February 1994.[7]  Following that change, a significant number of market participants continued to use SOES for executing trades, simply by submitting two 500-share trades instead of a single 1000-share trade.  Given that a lower share limit failed to stem the activities of short-term day traders, NASDAQ subsequently restored the 1000 share limit in March 1995.[8]  Nevertheless, NASDAQ systems, since the advent of automated execution, have

---

[5] Harris and Schultz (1997) examine the impact of firm quotes on NASDAQ trading behavior.
[6] Instinet, an alternative electronic trading venue founded in 1969, executed institutional orders for NASDAQ-listed stocks, but reported these transactions via NASDAQ systems until early 2003.
[7] See Harris and Schultz (1997) for further details.
[8] See Laux (1995).

included trades executed on various venues—trades executed via SOES, but also trades executed on Instinet and trades internalized by market makers (and subsequently reported to NASDAQ).

16.   Behind the scenes, NASDAQ developed two computer systems to handle the burgeoning amount of information related to NASDAQ-listed stocks—one in Trumbull, Connecticut and a fully-redundant alternative in Rockville, Maryland. These two computer facilities remained the backbone of NASDAQ technology systems until NASDAQ sold the Rockville site in June 2005. Subsequently, in July 2006, a Trumbull site was sold, with "systems engineering" remaining in Connecticut.[9]  By the end of 2008, the Trumbull site only included "general office space."  At the end of 2010, NASDAQ listed no New Jersey properties among its "Principal Properties," but it operated at least two computer facilities in different states, one in Carteret, New Jersey and another in Ashburn, Virginia.

17. Through the mid-1990s, trading in NASDAQ stocks remained segmented between NASDAQ's SOES, Instinet and internalized market maker trades.  In fact, day traders commonly took advantage of pricing differences between NASDAQ quotes and Instinet quotes to arbitrage away discrepancies in prices (which could be displayed effectively in a well-designed front-end system).[10]

18.  In 1997, NASDAQ trading became further segmented when NASDAQ implemented mandatory order handling rules dictated by the U.S. Securities and Exchange Commission (SEC).[11]  For the first time, superior quotes placed by NASDAQ market makers in private trading venues (like Instinet) began to be displayed on NASDAQ systems.  These new order handling rules sparked competition for fast and efficient trade execution, and opened the door for the

---

[9] The following facts are take from various NASDAQ 10-K filings.
[10] See Harris and Schultz (1998).
[11] See Barclay et al. (1999) for further details.

development of electronic communications networks (ECNs) where market makers could route orders they did not wish to represent in their own quotes.

19.  The advent of electronic communications networks (ECNs) spawned by the 1997 order handling rules was facilitated by NASDAQ's open architecture, allowing various market participants to connect directly to NASDAQ systems.  ECNs allowed traders to route orders directly to other market participants electronically without going through a market maker's trading desk.  Within five years, ECNs had gained almost 50% market share in NASDAQ-listed stocks.  By 2002, trades reported across NASDAQ systems were more than likely executed between counterparties on ECNs or against market maker inventories than on NASDAQ systems.

20.  While NASDAQ-listed trades were executed in numerous venues, NASDAQ systems continued to clear and report trades to the consolidated tape until early 2003.  At this time, ECNs recognized that that they could share in trading revenues for trades executed on their platforms.  In early 2003, the Island ECN began clearing and printing trades off NASDAQ systems, with other ECNs following suit in short order.  Within a year, NASDAQ's share of cleared (and printed) trades had dropped below 50%.  Given the various routing possibilities for trades in NASDAQ-listed stocks, it was much more likely for orders to be executed elsewhere than on NASDAQ systems.

21.  ECN trading technology has proven to be superior to legacy exchange technology systems.  The Archipelago ECN acquired the Pacific Stock Exchange (forming ArcaEx), which was purchased by the New York Stock Exchange (NYSE) in 2005.  ArcaEx now executes approximately half of all NYSE system volume.  Similarly, NASDAQ bought the combined Instinet/Island (INET) ECN in 2005 and now operates all NASDAQ trading on the INET

technological platform.[12]   The acquisition of INET brought back nearly 30% of NASDAQ-listed

volume to NASDAQ-owned systems.   Despite this fact, current data shows that NASDAQ market

share (executed volume as a percentage of total NASDAQ-listed, Tape C volume) has fallen

further, to below 30%.[13]

22.  During early 2010 orders for NASDAQ-listed stocks were much more likely to be

executed elsewhere than on NASDAQ systems.  Orders for HDIX stock, for instance, could have

been executed against a market maker's inventory, crossed against another order by the market

maker, or routed to the NYSE's ArcaEx, the BATS Exchange, DirectEdge (formerly the Attain

ECN), the National Stock Exchange, the Chicago Stock Exchange, or the CBOE Stock Exchange

instead of being executed on NASDAQ systems.  Simply stated, a NASDAQ-listed stock is more

likely to be traded in a large number of other venues rather than on NASDAQ systems.

**IV.  Discussion of Issues Specific to this Case**

23. As noted above, NASDAQ listing does not establish that a trade is purchased, ordered,

executed, cleared or otherwise conducted in New Jersey.  Notwithstanding the fact that NASDAQ

operates computer facilities in New Jersey and Virginia, Home Diagnostics, Inc, or HDIX, was

incorporated in Delaware with principal offices located in Florida.[14]  When an investor buys or

sells shares of the company, the shares represent ownership of a percentage of equity in HDIX, a

company with no connection to New Jersey.

24. According to the Blue Sheet provided for this case, the brokerage houses and

investment banks involved in trading HDIX were not located in New Jersey, but rather in New

---

[12] Overseas, a large fraction of European stock trading is now executed on Chi-X, a firm holding the license to use NASDAQ's technology for trading in Europe.
[13] See http://batstrading.com/market_summary/
[14] See http://www.sec.gov/Archives/edgar/data/884909/000095012310008433/g21981e8vk.htm

York, Illinois or Massachusetts.  While Pershing, LLC is a participating market maker, it is part of a larger corporate umbrella of BNY Mellon, which is headquartered in New York.

25. As noted above, the NASDAQ Stock Market does not buy or sell stock, but rather provides a network for market makers, ECNs and other trading facilities to compete with each other by placing bids and offers within the National Market System.  While NASDAQ operates a matching system for trades, the majority of trades reported via NASDAQ systems are executed and perhaps cleared elsewhere. NASDAQ does not maintain inventories of stock.  While the transactions for the orders in question employed NASDAQ systems (at some indeterminate location), payments for these trades were handled by the headquarters of a broker in New York. The route that the order took should not be confused with the place at which commerce was conducted.[15]

26. Generally when placing orders, customers rely on their broker's order routing systems, which scan the market for the best available execution to comply with best execution standards proscribed in the SEC's Reg NMS.  A smart order routing system continually scans competing market centers (ECNs, market maker quotes, etc.) and automatically routes orders to the best market for that stock, taking into account the quoted size (number of shares), quoted price, liquidity-taker costs, liquidity-provider rebates and the availability of automated execution. Market makers/brokers may execute trades against their own inventory or on their own trading platforms (as opposed to on another exchange).  In these cases, parties to the trade report the trade information to a central clearing facility for clearing and settlement.

---

[15] Various entities outside of New Jersey are represented in the HDIX Blue Sheet data.  For instance, AUTO stands for Automated Trading Desk Financial Services based in South Carolina, BTIG is a sales trader crossing network based in New York, CDRG stands for Citadel Securities, based in Illinois, and ITGI represents ITG's institutional crossing network based in New York.

27.   Reflecting the fact that NASDAQ-listed stocks are not necessarily traded on the NASDAQ (even if reported to NASDAQ systems), the SEC includes both market makers and exchanges as "market centers."  SEC Rule 11Ac1-5 requires a "market center" (as defined in the Rule) that trades NASDAQ national market system securities to produce monthly, public electronic reports of execution quality.   The term "market center" is defined in paragraph (a)(14) as "any exchange market maker, OTC market maker, alternative trading system, national securities exchange, or national securities association." Relevant to NASDAQ-listed stocks, the Rule defines an "exchange market maker" as "any member of a national securities exchange that is registered as a ... market maker pursuant to the rules of such exchange." Likewise, an "OTC market maker" is defined as "any dealer that holds itself out as being willing to buy from and sell to its customers, or others, in the United States, a national market system security for its own account on a regular or continuous basis otherwise than on a national securities exchange in amounts of less than block size."[16] Thus, in NASDAQ-listed stocks, a market center may be an exchange (like NASDAQ), a registered market maker, or a dealer.

28.   In fact, any firm acting as both an exchange market maker and an OTC market maker must report 11Ac1-5 statistics separately on its trading in each venue. The Rule provides the investing public with order execution information to assist in order routing decisions. With this Rule, the SEC acknowledged that different entities can apply different trading systems that can affect order execution quality.  Of importance in the current case is that market makers can execute customer orders against their own account or match/cross two customer orders against each other in their role as a market center, which then includes requirements for reporting execution quality.  With the Rule, the SEC acknowledges that market makers can (and do) execute trades as "market centers."

---

[16] See SEC Rule 11Ac1-5, paragraphs (a)(9) and (a)(18).

11

29. To determine whether the trades at issue in this case were purchased, ordered, executed, cleared or otherwise conducted on NASDAQ, I examined data in the "HDIX+2.xlsx" spreadsheet (henceforth referred to as "clearing data") provided by the prosecution, which I understand was obtained from the Financial Regulatory Agency (FINRA). The spreadsheet appears to contain data from the FINRA/NASDAQ Trade Reporting Facility (TRF), "an automated trade reporting and reconciliation service operated on the ACT technology platform. The TRF electronically facilitates the post-execution steps of price and volume reporting, comparison and clearing of trades for NASDAQ-listed securities as well as for transactions in NYSE- and other U.S. regional exchange-listed securities that occur off the floor. The TRF handles transactions negotiated broker-to-broker."[17]  Note that this spreadsheet is compiled on NASDAQ's ACT technology platform and presents *post-execution* data. This TRF clearing data resides on NASDAQ systems both in Carteret, New Jersey and Ashburn, Virginia.

30. Note that the TRF distributes revenue to firms executing orders based directly on shares and trades reported to this system and the collection of this data on the TRF does not establish any connection between this post-execution data and the state of New Jersey.  In fact, traders in NASDAQ-listed stocks can choose to clear trades on systems other than this TRF. Firms qualify for various tiers of revenue sharing on a per tape basis (NASDAQ-listed trades are reported on Tape C), and NASDAQ provides a financial incentive to report trades to their TRF. According to NASDAQ, the benefits of reporting to their TRF include:

• Free printing of Locked-In Trades reported to the FINRA/NASDAQ TRF in Tape C (NASDAQ-listed) securities;

• The Data Revenue Sharing Program shares the maximum of 50% of data revenue returned back to entering firms;

---

[17] See http://www.nasdaqtrader.com/Trader.aspx?id=ACT

• The FINRA/NASDAQ TRF uses ACT technology (used for collecting trade information for clearing) which has an established technical infrastructure, embedded trade reporting rules, complete regulatory environment, embedded functionality and logic which allows broker-dealers to meet regulatory obligations, and proven data return and data management within a reliable system;

• Various connectivity options, including CTCI, FIX, WeblinkACT 2.0 and the NASDAQ Workstation;

• Complete connections with participants in the OTC and third markets through existing inter-broker agreements;

• Match/Compare functionality for brokers who lack formal arrangements.[18]

31.  Within the clearing data, a number of data fields speak to the manner in which the trade is handled prior to clearing.  The REPORT_CAPACITY field, for instance, indicates P for principal, A for agency and R for riskless principal trades.  When the code is P, the market maker traded directly with a client from market making inventory.  When A, the market maker traded on the behalf of another client (as the client's agent).  When R, the market maker received a customer order and immediately executed an identical order in the marketplace (while taking on the role of principal) in order to fill the customer order.  In this regard, the clearing data identifies parties to *trades that have already occurred* and are simply being reported to the TRF for the revenues and benefits documented by the TRF above.

32.  The TRD_SRC_CD field indicates the source of the trade report, with J indicating data sent to the TRF by DirectEdge and N indicating data sent by NASDAQ on behalf of market participants.  The REPORT_IND can be B for buy, S for sell or X for crossed trade (where customer traded directly with customer) and the market maker simply reported the trade to

---

[18] See http://www.nasdaqtrader.com/content/ProductsServices/Trading/TradeReporting/trf_revshare_factsheet.pdf

NASDAQ.  Individual market makers report these buy, sell and crossed trade indicators, with the sell side market maker responsible for reporting trades. When non-members sell to NASDAQ members, the trade is reported as a buy.

33.  The MEDIA_REPORT_IND is either R for reported or N for non-reported trades.[19] This field is used exclusively for clearing purposes. Each trade is reported to the tape only once. As noted above, however, orders may be routed to multiple venues for execution.  When trades get routed to different venues, these venues report executions back to NASDAQ so that NASDAQ can follow the order and only count it as one trade. Importantly, an order might get routed (sent) to multiple venues before executing and the non-reported trade records serve to trace an order to the ultimate buyer and seller of the stock.

34. Note that the REPORTED_QTY always equals ENTERED_QTY in the clearing report.  The report does not show the orders behind these trades, but rather each fraction of an order (or multiple orders) that found a counterparty at the time of the trade.  Any order might be split by the broker/exchange and filled in multiple parts and/or routed to multiple venues.  In fact, large orders are almost never taken to the market for the full number of shares, but rather are broken up before executing or even after partially executing to avoid moving market prices against the trader.  As noted above, smart order routing systems can route parts of each order to multiple venues for simultaneous or serial execution, depending where depth and liquidity is anticipated or seen (into a dark pool, an ECN or exchange).  Indeed, even smart order routing systems face partial executions so that some shares can either remain on a limit order book or can be routed to a second or even a third execution facility (typically an ECN or exchange).

---

[19] By convention, the sell side of the trade reports the trade when both parties are NASDAQ market makers. For trades involving non-NASDAQ market makers (e.g. institutional clients trading for their own account) the member reports no matter whether buying or selling.

35.   As noted above, the location of NASDAQ servers moved from Rockville, Maryland in June 2005 and from Trumbull, Connecticut sometime between July 2006 and December 2008. The (NASDAQ TRF) clearing data provided in this case resides on NASDAQ systems both in Carteret, New Jersey and Ashburn, Virginia.  Even if NASDAQ systems served to match two incoming orders and subsequently reported this match to the corresponding brokers, there is a distinction between "order execution" and "order clearing." While "order execution" facilitates electronic transactions, "order clearing" represents commercial activity, and is often handled by systems other than NASDAQ's.  For trades in all U.S. equities like HDIX, the National Securities Clearing Corporation (NSCC), a subsidiary of the Depository Trust & Clearing Corporation, serves as central counterparty clearing agent. The NSCC is located in New York.

36.   In the trading environment relevant to early 2010, trading in NASDAQ-listed issues had become even more complicated than tracing the venue of execution across ECNs, market makers and markets.  During recent years, dark pools have further eroded NASDAQ market share. Dark pools accept orders routed through their proprietary systems and match up traders when possible.  If no match is found for a given order, or partial match is found, the dark pool routes the order (or the remaining unexecuted part) to another venue—likely an ECN or other market (like BATS or NASDAQ). This routing complicates venue considerations since much of this routing is done prior to an order hitting NASDAQ clearing systems and completed trades (but not routing decisions) are usually reported only to NASDAQ's Trade Reporting Facility (TRF), a system that NASDAQ operates on behalf of FINRA.  The TRF electronically facilitates the post-execution reporting of prices and volume and facilitates clearing for trades in NASDAQ-listed securities.  As dark pool trading has grown to be more prevalent in recent years, the venue of execution for any single order has become even more opaque.

15

37.  For the above reasons, it is my considered opinion, to a reasonable degree of professional certainty, that there is no basis to conclude that the trades at issue in this case, or any portion of them, were ordered, purchased, executed, cleared or otherwise conducted in New Jersey.

## V.  Critique of Statements Made in the Superseding Indictment

38.  *Paragraph 1(c): "Since at least 2006, and at all times relevant to the Indictment, NASDAQ's data centers, through which all trading activity was conducted, were located in Carteret, New Jersey."*  This is inaccurate.  Given the various alternatives for routing orders electronically, the location of NASDAQ data centers is largely immaterial to the question of where trading activity was in fact conducted.  Contrary to this allegation, NASDAQ data centers simply facilitate reporting of trades done in many other places.  NASDAQ lists no New Jersey properties among their "Principal Properties" in their 2010 10-K report to the SEC, although they do maintain and operate data servers in both Carteret, New Jersey and Ashburn, Virginia designed to provide redundancy.  The need for redundancy dictates that NASDAQ computer systems and clearing data exist in both locations. Executed trades are reported to both sites. Furthermore, many reported clearing records in this case were reported to NASDAQ systems by DirectEdge (denoted J in data field TRADE_SRC_CD), making the location of NASDAQ data servers irrelevant.   There is no basis for the allegation that any of the trades at issue in this case were conducted on NASDAQ's servers in Carteret, New Jersey.

39.  *Paragraph 1(d): "Knight Equity Markets L.P. ("Knight"), located in Jersey City, New Jersey, was a registered broker-dealer that operated as a market maker in equity securities, primarily those traded on the NASDAQ and on the OTC Bulletin Board. At all times relevant to this Indictment, Knight maintained computer servers in Jersey City, New Jersey, and all trades*

16

*made through Knight were conducted through the New Jersey-based servers."* The location of Knight's computer servers is not relevant to where trades actually occurred. Knight (represented as NITE in the clearing data) consistently reports an execution labeled P (for principal) or R (for riskless principal) in the data field titled REPORT_CAPACITY. The trades marked principal trades signify that Knight is buying or selling for its own account and at its own risk (rather than carrying out trades for Knight's clients).

40. For the riskless principal trades, Knight is reporting that they received a customer order and immediately executed an identical order in the marketplace (while taking on the role of principal) in order to fill the customer order. In other words, Knight's execution is represented in the clearing data, but not the customer's execution. Since September 30, 1999, the SEC has permitted market makers to only report one leg of these riskless principal transactions, rather than both legs. There is thus no basis to conclude that any of the trades at issue is this case were conducted through Knight's New Jersey-based servers. What can be stated conclusively is that the ultimate clearing and settlement for U.S. equities takes place through the NSCC, located in New York.

41. *Paragraph 1(e):  "Pershing LLC ("Pershing"), located in Jersey City, New Jersey, was a financial services firm providing market access and trade execution services to its clients, including allowing its clients to electronically buy and sell securities.  At all times relevant to this Indictment, Pershing maintained computer servers in Jersey City, New Jersey."* Again, the location of computer servers providing market access is not a relevant fact. Pershing (represented as PERS in the clearing data) consistently reports agency executions against UBS Securities LLC (or "UBS", represented as UBSS in the clearing data). In each instance, UBS reports trades labeled P (for principal) or R (for riskless principal) in the data field titled

REPORT_CAPACITY.  The trades marked principal trades signify that UBS is buying or selling for its own account and at its own risk (rather than carrying out trades for UBS's clients).

42.  For the riskless principal trades, UBS is reporting that they received a customer order and immediately executed an identical order in the marketplace (while taking on the role of principal) in order to fill the customer order.  In other words, UBS's execution is represented in the clearing data, but not the customer's execution. As noted above, the SEC permits market makers to only report one leg of these riskless principal transactions, rather than both legs, indicating again the lack of any basis to conclude that any of the trades at issue is this case were purchased or executed through computer servers Pershing maintained in New Jersey.  As noted above, however, it can be stated conclusively that the ultimate clearing and settlement for U.S. equities takes place through the NSCC in New York.

43.  *Paragraph 5:  "Knowing that the Inside Information had been disclosed in violation of defendant GEORGE HOLLEY's duties of trust and confidence, the Investors then executed securities transactions on the basis of the Inside Information, earning profits from the scheme."* As noted above, the execution of securities in this case cannot be traced to New Jersey. NASDAQ and other market participants may maintain computer facilities in New Jersey, but based on the principal and riskless principal trades denoted in the clearing data, there is no basis to conclude that any of the trades at issue is this case were executed in New Jersey.  The ultimate clearing and settlement for U.S. equities takes place through the NSCC in New York.

44. *Paragraph 15:  "After opening the Merrill Lynch Account and funding it with the approximately $120,000 that defendant GEORGE HOLLEY had provided, S.D. instructed the broker to use the entire $120,000 to purchase shares of Home Diagnostics.  Acting on these instructions, between on or about January 19, 2010 and on or about January 21, 2010, the*

18

*broker purchased more than 18,000 shares of Home Diagnostics stock.  All of these purchases were executed at NASDAQ's data center in Carteret, New Jersey."*  As noted above, the place of execution cannot be traced to New Jersey since the clearing records of executed trades are reported to both of NASDAQ's data centers (one of which is in Carteret, New Jersey and the other of which is in Ashburn, Virginia).  Furthermore, Merrill Lynch is incorporated in Delaware with headquarters in New York and is part of Bank of America (headquartered in North Carolina). The evidence does not support the allegation in the Superseding Indictment that purchases of HDIX through Merrill Lynch were executed at NASDAQ's data center in Carteret, New Jersey. The ultimate clearing and settlement for these purchases takes place through the NSCC, located in New York.

45. *Paragraph 19:  "On or about January 15, 2010, Investor #1 purchased approximately 1,000 shares of Home Diagnostics stock based at least in part on the Inside Information that defendant GEORGE HOLLEY provided to Investor #1.  These shares were ordered and cleared through Pershing's data servers in New Jersey, and then held in an electronic account on Pershing's data servers in New Jersey."*  Regarding the trades of Investor #1, the location of computer servers providing market access is not a relevant fact. The orders in question were likely sent to Pershing (an affiliate of The Bank of New York Mellon, located in New York) from computers at Westport Resources in Connecticut, but there is no basis to conclude that these trades were ordered or cleared in New Jersey.  For each of the reported trades, Pershing (represented as PERS in the clearing data) reports an agency execution against UBS Securities LLC (or "UBS", represented as UBSS in the clearing data).  In each instance, UBS reports trades labeled P (for principal) or R (for riskless principal) in the data field titled REPORT_CAPACITY.  The trades marked principal trades signify that UBS is buying or selling

19

for its own account and at its own risk (rather than carrying out trades for UBS's clients). These reports indicate that the trade with Investor #1 likely occurred before these trades were reported via UBS servers to NASDAQ systems.

46.   For the riskless principal trades, UBS is reporting that they received a customer order and immediately executed an identical order in the marketplace (while taking on the role of principal) in order to fill the customer order.  In other words, UBS's execution is represented in the clearing data, but not the customer's execution. As noted above, the SEC permits market makers to only report one leg of these riskless principal transactions, rather than both legs, indicating again that there is no basis to conclude that any of these trades were ordered or cleared in New Jersey.  The ultimate clearing and settlement for U.S. equities takes place through the NSCC, located in New York.

47.   *Paragraph 26: "Between on or about January 13, 2010 and on or about January 21, 2010, Investor #3 purchased approximately 12,700 shares of Home Diagnostics stock based at least in part on the Inside Information that defendant GEORGE HOLLEY provided to Investor #3. All of these shares were purchased from Knight in New Jersey."*  Regarding the trades of Investor #3, the location of Knight's computer servers is not a relevant fact. The orders in question were likely entered from the customer's computer or broker's computer at Scottrade in Illinois, but there is no basis to conclude that these shares were "purchased" in New Jersey.  For each of the reported trades, Knight (represented as NITE in the clearing data) reports an execution labeled P (for principal) or R (for riskless principal) in the data field titled REPORT_CAPACITY.  The trades marked principal trades signify that Knight is buying or selling for its own account and at its own risk (rather than carrying out trades for Knight's

clients). These reports indicate that the trade with Investor #3 likely occurred before these trades were reported via Knight servers to NASDAQ systems.

48.  For the riskless principal trades, Knight is reporting that they received a customer order and immediately executed an identical order in the marketplace (while taking on the role of principal) in order to fill the customer order.  In other words, Knight's execution is represented in the clearing data, but not the customer's execution. Since September 30, 1999, the SEC has permitted market makers to only report one leg of these riskless principal transactions, rather than both legs, indicating again that there is no basis to conclude that any of Investor #3's trades were purchased in New Jersey.  The ultimate clearing and settlement for U.S. equities takes place through the NSCC, located in New York.

## VII.  Summary and Conclusion

49.  Based on my knowledge and experience as applied to the materials provided to me, it is my considered opinion, to a reasonable degree of professional certainty, that there is no factual basis for concluding that any of the securities trades at issue in this case were conducted in New Jersey.

Dated June 15, 2012                    _____

                                              Jeffrey H. Harris

## VI. References

Barclay, Michael J., William G. Christie, Jeffrey H. Harris, Eugene Kandel and Paul H. Schultz, 1999, Effects of market reform on the trading costs and depths of NASDAQ stocks, *Journal of Finance* 54, 1-34.

Harris, Jeffrey H. and Mohsen Saad, 2005, The sound of silence, Syracuse University Working Paper.

Harris, Jeffrey H. and Paul H. Schultz, 1997, The importance of firm quotes and rapid executions: Evidence from the January 1994 change in SOES, *Journal of Financial Economics* 45, 135-166.

Harris, Jeffrey H. and Paul H. Schultz, 1998, The trading profits of SOES bandits *Journal of Financial Economics* 50 39-62.

Laux, Paul, 1995, NASDAQ trading costs, SOES rules, and NASDAQ electronic trading: an assessment using audit trail data. Unpublished working paper.

Smith, Jeffrey W., Jamie Selway, and D. Timothy McCormick, 1998, The development of NASDAQ trading systems, NASDAQ working paper 98-02.

Exhibit 1—Curriculum Vitae of Jeffrey H. Harris

# JEFFREY H. HARRIS

624 Whitman                    .              3941 Livingston St. NW
Syracuse University                           Washington, DC 20015
Syracuse, NY  13244                           Home: (202) 686-5955
(315) 443-4843                                Cell: (202) 491-7124
jhharr03@syr.edu                              jeffreyhharris@gmail.com

## Education
Ph.D., Business Administration, Finance.  The Ohio State University, 1995

M.B.A., Finance.  The University of Iowa, 1987

B.A., Physics.  Economics Minor.  The University of Iowa, 1986
                        Attended Luther College, 1982-84

## Employment History
Syracuse University, Dean's Chair in Finance, 2011-Present

University of Delaware, Professor, 2006-11
                        Associate Professor, 2003-06
                        Assistant Professor, 2001-03

Southern Methodist University, James M. Collins Chair (Visiting), 2010-11

U.S. Commodity Futures Trading Commission, Chief Economist, 2007-10
                        Visiting Academic/Consultant, 2006-07

University of Notre Dame, Assistant Professor, 1995-2001

NASDAQ Department of Economic Research, Visiting Academic Fellow, 2000-01

U.S. Securities and Exchange Commission, Visiting Academic Scholar, 1999-2000

The Ohio State University, Visiting Assistant Professor, 1995-97

## Publications
 "Who Drove and Burst the Tech Bubble" with John M. Griffin, Tao Shu and Selim Topaloglu,
2011, *Journal of Finance* 66, 1251-1290.

"Clearing House, Margin Requirements, and Systemic Risk" with Jorge A. Cruz Lopez and
Christophe Pérignon, 2011, *Review of Futures Markets* 19, 39-54.

"The Role of Speculators during Periods of Financial Distress" with Naomi Boyd and Arkadiusz Nowak, 2011, *Journal of Alternative Investments* 14, 10-25.

"Effects of Central Bank Intervention on the Interbank Market during the Subprime Crisis" with Celso Brunetti and Mario di Filippo, 2011, *Review of Financial Studies* 24, 2053-2083.

"The Role of Speculators in the Crude Oil Futures Markets" with Bahattin Büyükşahin, 2011, *The Energy Journal* 32, 167-202.

"Why to Maturing Futures and Cash Prices Diverge for Agricultural Commodities?" with Nicole Aulerich and Raymond P.H. Fishe, 2011, *Journal of Futures Markets* 31, 503-533.

"Why are IPO Investors Net Buyers through Lead Underwriters?" with John M. Griffin and Selim Topaloglu, 2007, *Journal of Financial Economics* 85, 518-551.

"How New Entry in Options Markets affected Market Making and Trading Costs" with Patrick DeFontnouvelle and Raymond P.H. Fishe, 2005, *Journal of Investment Management* 3, 24-40.

"The Development of Secondary Market Liquidity for NYSE-Listed IPOs" with Shane A. Corwin and Marc L. Lipson, 2004, *Journal of Finance* 59, 2339-2374, Awarded Outstanding Paper in Financial Institutions at the 2002 Southern Finance Association Meeting.

"The Dynamics of Institutional and Individual Trading" with John M. Griffin and Selim Topaloglu, 2003, *Journal of Finance* 58, 2285-2320.  Nominated for the Smith-Breeden Prize.

"The Behavior of Bid-Ask Spreads and Volume in Options Markets During the Competition for Listings in 1999" with Patrick DeFontnouvelle and Raymond P.H. Fishe, 2003, *Journal of Finance* 58, 2437-2463. Nominated for the Smith-Breeden Prize.

"NASDAQ Trading Halts: The Impact of Market Mechanisms on Prices, Trading Activity and Execution Costs" with William G. Christie and Shane A. Corwin, 2002, *Journal of Finance* 57, 1443-1478.

"The Initial Listing Decisions of Firms that Go Public" with Shane A. Corwin, 2001, *Financial Management* 30, 35-55.

"The Effect of NASDAQ Market Reform on Trading Costs and Depths" with Michael J. Barclay, William G. Christie, Eugene Kandel, and Paul H. Schultz, 1999, *Journal of Finance* 54, 1-34. Nominated for the Smith-Breeden Prize.

"The Trading Profits of SOES Bandits" with Paul H. Schultz, 1998, *Journal of Financial Economics* 50, 39-62.

"The Importance of Firm Quotes and Rapid Executions:  Evidence from the January 1994 SOES Rules Change" with Paul H. Schultz, 1997, *Journal of Financial Economics* 45, 135-166.

"Why Did NASDAQ Market Makers Stop Avoiding Odd-Eighth Quotes?" with Paul H. Schultz and William G. Christie, 1994, *Journal of Finance* 49, 1841-1860.

## Book Chapters/Articles in Books

"The Changing Structure of Energy Futures Markets" with Bahattin Büyükşahin, James A. Overdahl and Michel A. Robe, 2009, in *Finance et Valeurs*, A. Corhay, G. Hubner and A. Miller, editors, ULg Press, Belgium.

"Equity Market Derivatives" with L. Mick Swartz, 2009, in *Financial Derivatives* (Robert W. Kolb Series in Finance), Bob Kolb and Jim Overdahl, editors, John Wiley and Sons, Inc.

"Tick Size, Market Structure and Trading Costs" with William G. Christie and Eugene Kandel, 2008, in *Stock Market Liquidity: Implications for Market Microstructure and Asset Pricing*, Francois-Serge L'habitant and Greg N. Gregoriou, editors, John Wiley and Sons, Inc., 173-197.

## Working Papers

"CoMargin: A System to Enhance Financial Stability" with Jorge A. Cruz Lopez, Christophe Hurlin and Christophe Perignon.

"Speculation, Prices and Market Volatility" with Celso Brunetti and Bahattin Büyükşahin.

"The Impact of Herding on Futures Market Prices" with Naomi Boyd, Bahattin Büyükşahin and Michael S. Haigh.

"Herding and Speculation in the Crude Oil Market" with Celso Brunetti and Bahattin Büyükşahin.

"Funding Constraints and Liquidity Contagion in U.S. Equity and Treasury Markets" with Christof W. Stahel.

"Do Institutional Traders Predict Bull and Bear Markets?" with Celso Brunetti and Bahattin Büyükşahin.

"Fundamentals, Trader Activity and Derivative Pricing" with Bahattin Büyükşahin, Michael S. Haigh, James A. Overdahl and Michel A. Robe.

"Trading Networks" with Lada Adamic, Celso Brunetti and Andrei Kirilenko.

"Off but Not Gone: A Study of NASDAQ Delistings" (formerly titled "From Pink Slips to Pink Sheets: Market Quality around NASDAQ Delisting") with Venkatesh Panchapagesan and Ingrid M. Werner.

"Stepping Ahead of the Book" with Amy K. Edwards.

"Liquidity Risk, Investor Flux and Post-Earnings Announcement Drift" with Kirsten L. Anderson and Eric So.

"The Sound of Silence" with Mohsen Saad.

"Investor Behavior Surrounding Earnings Announcements" with Kirsten L. Anderson and Selim Topaloglu.

## Work-In-Progress
"Price Discovery in Crude Oil Futures Markets" with Bahattin Büyükşahin.

"The Long and Short of Dealer Profits" with Jay F. Coughenour.

## Teaching Experience
Investment Analysis (MBA), 2001-04, 2006.
Portfolio Theory (MBA), 2010.
Derivative Investments (MBA), 1996-97, 2005, 2010.
Management of Financial Institutions (MBA), 1995-97.
Investments, 2001-06, 2010.
Options and Futures, 1994-97, 2005.
Speculative Markets, 2010.
Financial Institutions Management, 1997.
Introductory Managerial Finance, 1997-99.

## Presentations
"Gasoline Prices and the Changing U.S. Oil Market" Presented to the Congressional Research Service.

"Funding Constraints and Liquidity Contagion in U.S. Equity and Treasury Markets" Presented at Syracuse University.

"Energy Markets and Dodd-Frank: Where are we now?"
Presented at the 2012 Fulbright Jaworski/Cornerstone Research conference on Dodd-Frank's Impact on the Energy Markets and at Resources for the Future.

"Do Institutional Traders Predict Bull and Bear Markets?"
Presented at the New York Accounting and Finance Forum and Syracuse University.

"Speculation, Prices and Market Volatility"
Presented at the University of Mississippi and the University of Delaware Economics Seminar.

"The Evolving Landscape for Derivative Regulation"
Presented at Fulbright Jaworski Oil and Gas Compliance Seminar, HEC Paris, NASDAQOMX, the Universita Politecnica delle Marche, Ancona, Italy, the Vanderbilt University Conference on Regulatory Change in the Global Financial System,  Cornerstone Research and the Platts Oil Trading and Risk Management Forum.

"Effects of Central Bank Intervention on the Interbank Market during the Sub-Prime Crisis"
Presented at the Universita Politecnica delle Marche, Ancona, Italy.

"Trading Networks"
Presented at Rutgers University, Southern Methodist University, Syracuse University, Temple University and Villanova University.

"Improving Market Transparency"
Presented at the 2009 CFTC Symposium for International Market Authorities.

"Abusive Conduct from an Economist's Perspective"
Presented at the 2009 CFTC Division of Enforcement International Regulators Conference.

"The Role of Speculators in the Crude Oil Futures Markets"
Presented at the NYSE/Euronext Amsterdam & Tinbergen Institute Workshop on Liquidity and Volatility in Today's Markets and the 2009 International Association of Energy Economists International Conference.

"Index Trading and Speculation in Commodity Futures Markets"
Presented at the CFTC Agricultural Forum, the American Agricultural Economics Association Meeting, the Mid-Atlantic Farm Credit Board of Directors annual meeting, the Council on Food, Agriculture and Resource Economics, the Washington Area Finance Association, the U.S.-India Financial and Economic Forum, the U.S. Department of State Bureau of Economic and Business Affairs, the 2008 CFTC Symposium for International Market Authorities, the USDA/World Bank Food Panel, the 2008 IOSCO Conference on Speculation and Volatility in Commodity Markets, the Canadian Securities Administration, the Energy Information Administration (Department of Energy), the 2009 NCCC-134 Meeting on Applied Commodity Price Analysis, Forecasting and Market Risk Management, the Kansas City Federal Reserve Panel on Agricultural Finance, the 2009 EIA Energy Conference, the American Petroleum Institute, the 2009 FIA Legal and Compliance Conference, HEC Paris, the 2009 Canadian Economics Association meeting, Terrapinn 2011 World Commodities Week and the 2011 InVivo Paris Conference on Speculation in Agriculture Markets.

"Increasing Internationalization of the Financial Markets"
Presented at the Chatham House, London.

"Index Funds and Data Dissemination in Crude Oil Markets"
Presented at the 2008 International Energy Agency Expert Roundtable on Oil Price Formation and to the U. S. CFTC Energy Markets Advisory Committee.

"The Impact of Herding on Futures Market Prices"
Presented at the 2007 CFTC Symposium for International Market Authorities.

"Price Discovery in U.S. Natural Gas Futures Markets"
Presented to the U.S. CFTC.

"Market Growth, Trader Participation and Pricing in Energy Futures Markets"
Presented at the Arizona State University, the 2007 MIT Center for Energy and Environmental Policy Research Conference and Johns Hopkins University.

"Liquidity Risk, Investor Flux and Post-Earnings Announcement Drift"
Presented at the University of Toronto and the University of Arizona.

"The Sound of Silence"
Presented at the U.S. CFTC and University of Delaware Brown Bag seminar series.

"Off but Not Gone: A Study of NASDAQ Delistings" (formerly titled "From Pink Slips to Pink Sheets: Market Quality around NASDAQ Delisting")
Presented at the University of Delaware, George Mason University and George Washington University.

"Why are IPO Investors Net Buyers through Lead Underwriters?"
Presented at American University, Case Western Reserve University, Drexel University, the University of Missouri—Columbia, Morgan State University and Temple University.

"Investor Behavior Surrounding Earnings Announcements"
Presented at the University of Delaware Brown Bag seminar series.

"Trading Behavior around the Rise and Fall of NASDAQ"
Presented at the University of Maryland and the University of Connecticut.

"The Effect of Decimals on NASDAQ Retail Trading"
Presented at the University of Delaware and 2002 Eastern Finance Association Meeting.

"The Development of Secondary Market Liquidity for NYSE-Listed IPOs"
Presented at NASDAQ, 2001 Financial Management Association Annual Meeting, 2002 Southern Finance Association Meeting, the University of Miami and the University of Delaware.

"Competition for Market Making in NYSE IPOs"
Presented at NASDAQ.

"NASDAQ Trading Halts: The Impact of Market Mechanisms on Prices, Trading Activity and Execution"
Presented at the 2000 Western Finance Association Annual Meeting, 2000 NBER Microstructure Conference, 2000 Financial Management Association Annual Meeting, Penn State University, the NASDAQ Stock Market, George Washington University and American University.

"The Initial Listing Decisions of Firms that Go Public"
Presented at the 1998 Financial Management Association Annual Meeting, the NASDAQ Stock Market, Syracuse University and Arizona State University.

"The Trading Profits of SOES Bandits"
Presented at the University of Georgia and the 1997 Financial Management Association Annual
Meeting.

"The Importance of Firm Quotes and Rapid Executions: Evidence from the January 1994 SOES
Rules Change"
Presented at The Ohio State University, University of Notre Dame and the 1997 American
Finance Association Annual Meeting.

"Cost Components of the Bid-Ask Spread: An Intraday Analysis"
Presented at the 1994 Financial Management Association Annual Meeting, University of
Arizona, University of Houston, University of Iowa, University of Miami, Michigan State
University and University of Notre Dame.

## Professional Activities
Professional Testimony
   "The Role of Speculative Investments in Energy Markets"
   Testimony before the United States Senate Subcommittee on Energy and Natural
   Resources, September 16, 2008.

   "Financial Speculation in Commodity Markets: Are Institutional Investors and Hedge
   Funds Contributing to Food and Energy Price Inflation?"
   Testimony before the United States Senate Committee on Homeland Security and
   Governmental Affairs, May 20, 2008.

   "The Influence of Speculative Traders in Commodity Markets"
   Testimony before the United States House of Representatives Agriculture  Committee,
May 15, 2008.

   "The Influence of Non-commercial Institutional Investors on Oil Prices"
   Testimony before the United States Senate Committee on Energy and Natural
   Resources, April 3, 2008.

Panelist,
   "Dodd-Frank and Commodity Markets" panel at the Terrapinn World
   Commodities Week, London 2011.
   "Speculation and Regulation in Energy Markets" panel at the Standard Chartered
   Bank Earth's Resources Conference, Hong Kong 2011.
   "The Regulatory World of Market Manipulation" panel at the American Bar
   Association Antitrust and Consumer Law Issues in the Energy Industry
   Conference, 2011.
   "Commodity Super-cycles" panel at Standard Chartered Bank New York
   Symposium, 2011.
   "World Oil Markets" panel moderator at the IEA/IEF/OPEC London Symposium
   on World Oil Markets, 2010.

"Assessing Dodd-Frank" panel on current financial regulation, National Association of Business Economists, 2010.
"What's Next?" panel on post-crisis regulation, Georgetown University, 2010.
"Sovereign CDS Markets" discussion panel at Georgetown University, 2010.

Referee,

*The Accounting Review, Eastern Economic Journal, Financial Management, Financial Review, International Review of Financial Analysis, Journal of Accounting and Public Policy, Journal of Banking and Finance, Journal of Business, Journal of Corporate Finance, The Journal of Economics and Business, Journal of Finance, Journal of Financial and Quantitative Analysis, Journal of Financial Markets, The Quarterly Review of Economics and Finance* and *Review of Financial Studies.*

Director,

Southern Finance Association 2010-Present

Track Chair,

Markets and Microstructure, Financial Management Association 2002
Markets and Microstructure, Midwest Financial Management Association 2003

Program Committee,

European Finance Association 2006-11
Financial Management Association 2002-10
Southern Finance Association 2008
Western Finance Association 2003-11

Session Chair,

Financial Management Association 2002, 2004-05
Southern Finance Association 2000, 2002, 2008
Eastern Finance Association 2002

Discussant,

Allied Social Sciences Association 2007
Financial Management Association 1996-97, 1999-2002, 2004-06
Ohio State Conference on Dealer Markets 1996
Notre Dame/NASDAQ Dealer Market Conferences 1999-2000
Southern Finance Association 2000, 2002, 2008
Western Finance Association 2001, 2004
Washington Area Finance Association 2000, 2002, 2004

Member,

American Finance Association
Financial Management Association
Southern Finance Association
Western Finance Association

Advisor,
> Lerner Finance Club (MBA) 2005-07
> Whitman Financial Management Association 2011-present

## Other Work Experience

Copy Editor, *Journal of Finance*, 1992-93
MBA Advisor/Graduate Admissions Coordinator, University of Iowa College of Business Administration, 1988-1991
Executive Trainee/Distributor, MAY Corporation Venture Stores Division, 1988

## Honors and Awards

Lerner College Outstanding Scholar Award, University of Delaware, 2008
Research Grants,
> Institute for Financial Markets, 2010
> Lerner College of Business and Economics, 2004, 2007
> University of Delaware General University Research Grant, 2006
> University of Delaware Department of Finance, 2005
> University of Notre Dame Mendoza College of Business, 1996, 1998-99

Nominated for University of Delaware Lerner College Teaching Award, 2004, 2006
Nominated for University of Delaware Lerner College Advising Award, 2004
Cited as "Prominent Faculty" in 2008, 2009, 2010, 2012 Business Week Rankings of
> Undergraduate Business Schools
Member, Beta Gamma Sigma

Exhibit 2—Materials Relied Upon

Clearing records: Excel file HDIX+2.xlsx

Pages+from+Bluesheet+Report+_Jan_.pdf+-+Adobe+Acrobat[1].pdf

2010_01_19.21025678.1533189229.BATES.pdf

2010_01_21.21025678.1351892462.BATES.pdf

2010_01_22.21025678.2083807663.BATES.pdf

FINRA-E-0000631.pdf

FINRA-E-0000637.xlsx

CLIENT CONFIRMATIONS - HISTORICAL - 0013H 3H96 18116684

ABSPG0000005255.pdf

JWR801572   DAILY TRADE ACTIVITY LOG 01.pdf

JWR801572   ORDER HISTORY DETAIL REPORT 01.pdf

JWR801572   ORDER HISTORY ORDER TRAIL REPORT 01.pdf

JWR801572 Statement Dec 2010.pdf

210-25678 (td 1-19-10).BATES.PDF

210-25678 (td 1-20-10).BATES.PDF

210-25678 (td 1-21-10).BATES.PDF

2010_01_19.21025678.1533189229.BATES.PDF

2010_01_21.21025678.1351892462.BATES.PDF

2010_01_22.21025678.2083807663.BATES.PDF